# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

No. 02-4330

JOHN P. KENNEDY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

VENROCK ASSOCIATES, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 383—**James F. Holderman**, *Judge.*

———————

ARGUED MAY 27, 2003—DECIDED OCTOBER 29, 2003

———————

Before BAUER, POSNER, and COFFEY, *Circuit Judges.*

POSNER, *Circuit Judge.* This is a suit by common sharehold-ers of Cadant, Inc. (now CDX Corporation). The defendants are two corporate entities that we'll call "Venrock" and "J.P. Morgan" and individuals associated with them, but we defer consideration of the individual defendants to the end of the opinion and till then use "defendants" to denote just the entities. The suit is based on federal securities law and state antifraud law. It charges the defendants, though they are not affiliated with each other (an important point to stress, because throughout the plaintiffs' briefs the defen-dants are lumped together under the name, coined by the plaintiffs' lawyers, "Venrock Affiliates," which is not to be

confused with "Venrock Associates," the name of one of the defendants), with having acted "in virtual tandem" to seize control of and plunder Cadant. In doing so they are alleged to have violated the fiduciary duty that they owed the plaintiffs by virtue of having obtained control of the corporation. The plaintiffs, who own roughly a quarter of the company's common stock, seek $100 million in damages.

Cadant is in bankruptcy, and the district judge dismissed the complaint on the ground that the plaintiffs' claims, though styled as individual ("direct") claims, really are derivative claims and thus belong to Cadant. If so, they must be litigated in the bankruptcy court—where the plaintiffs and the other shareholders would have to share any liquidation value with Cadant's creditors, who happen to include the defendants.

We construe the facts as favorably to the plaintiffs as the record, which is limited to the 123-page complaint and the exhibits attached to it, permits, while of course not vouching for the accuracy of the allegations. Cadant was formed in 1998 by Venkata Majeti and others to develop cable modem termination systems, which enable high-speed Internet access to home computers. Though based in Illinois, the company was incorporated in Maryland. Majeti and the other founders received common stock in the new corporation at the outset. The company issued additional stock the next year to the plaintiffs for $7-$8 million (the exact amount is not in the record). The year after that the company issued the defendants preferred stock for $12 million; others received preferred stock as well, but between them the defendants received and still own 90 percent of it. A principal of Venrock, named Copeland, became a member of Cadant's five-member board of directors. The other four board members, however, had no affiliation with either Venrock or J.P. Morgan. The plaintiffs irresponsibly contend

that one of the four, a Mr. Rochkind, though unaffiliated with either Venrock or J.P. Morgan, owned some of the preferred stock in Cadant and was therefore "aligned" with the defendants.

The following year, 2000, the board turned down a tentative offer by ADC Telecommunications to buy Cadant for some $300 million. Later that year the board proposed and the shareholders approved the reincorporation of Cadant in Delaware, which provides less protection to minority shareholders than Maryland does.

By the beginning of 2001, Cadant, like many other start-up companies in Internet-related businesses, was in deep financial trouble. The defendants—having spurned more favorable financing possibilities for Cadant (the leitmotif of this suit is that the defendants, although controlling the company, repeatedly missed chances to sell or finance it that would have saved it from insolvency)—agreed with each other and with the board of directors to make Cadant an $11 million bridge loan. (A bridge loan is a short-term loan to tide the borrower over while he seeks longer-term financing.) The loan was for 90 days at an annual interest rate of 10 percent and also gave the lenders warrants (never exercised) that they could use to purchase common stock. The terms were highly favorable to the lenders.

Only about 60 percent of the $11 million loan was lent by the defendants. The other owners of preferred stock were eligible to participate in the loan, including the director who though not affiliated with either Venrock or J.P. Morgan owned some of that stock. It is unclear whether he participated in the loan, but probably he did because the board voted him some options to buy common stock in Cadant.

Shortly before the bridge loan was made, a representative of J.P. Morgan had been added to Cadant's board, raising

the number of directors to six. And earlier, in September, one of the independent directors had been replaced by an employee of J.P. Morgan named Lyon, so that half the board was now controlled by the defendants. Shortly afterwards, still another representative of the defendants was added to the board, so that between them the defendants at last controlled a majority of the board's members (four out of seven). But this lasted only until March (2001), by which time Lyon had resigned from J.P. Morgan (the exact date of his resignation is unclear).

Within a couple of months of receiving the bridge loan, Cadant had run through the entire $11 million. In May the defendants arranged for a second bridge loan, this one for $9 million, which gave the lenders (who again included the defendants) a preference in the event that Cadant was sold or otherwise liquidated: they would be entitled to "an amount equal to 200% of (i) outstanding principal amount of the Loans plus (ii) any accrued but unpaid interest thereon." (On liquidation preferences generally, see Don Clark & Lisa Bransten, "E-Business: Starting Gate," *Wall St. J.*, Mar. 19, 2001, at B6; Colin Blaydon & Michael Horvath, "Liquidation Preferences: What You May Not Know," *Venture Capital J.*, Mar. 1, 2002, p. 45; see also Ravi Chiruvolu, "It May Be Time to Hit the Reset Button on Liquidation Preferences," *Venture Capital J.*, July 2002, p. 28. Of course a "liquidation preference" of sorts is implicit in the status of a lender or a preferred shareholder, since both have priority over common shareholders.) The first loan was then amended to add a (smaller) liquidation preference. The defendants discouraged a search for alternative financing on terms that would have been more favorable to Cadant, because they wanted to suck out Cadant's assets by means of the liquidation preferences.

Cadant defaulted on the second bridge loan. The lenders did not foreclose. Instead Cadant sold its entire assets to a

firm called Arris Group in exchange for stock worth at the time of the sale (January 2002) some $55 million, an amount just large enough to satisfy the claims of Cadant's creditors and preferred shareholders. The board turned down alternatives that would have been better for Cadant but worse for the defendants, who remember were preferred shareholders but also creditors by virtue of the bridge loans. The sale to Arris was approved by Cadant's board and also, as required by Delaware law and the articles of incorporation, by a simple majority of Cadant's common and preferred shareholders voting together as a single class and a simple majority of the preferred shareholders voting separately. Approval by two-thirds of "of all the votes entitled to be cast on the matter" would have been required had Maryland rather than Delaware corporation law governed Cadant, as it had done originally. Md. Code Ann., Corporations & Associations § 3-105(e). For while Maryland permits a corporation to opt out of the two-thirds requirement, *id.*, § 2-104(b)(5), Cadant had not done so. The record is silent on whose votes were "entitled to be cast on the matter" (just common shareholders, or preferred shareholders as well?), so we do not know the exact change in shareholders' rights that was brought about by the reincorporation.

The Arris stock became the property of the bankrupt estate. But because its price has since fallen by 60 percent (and it is Cadant's only asset), the estate is now worth even less than the claims of the bridge lenders and other creditors; and so the plaintiffs and the other shareholders, including the defendants in their capacity as owners of preferred stock in Cadant, stand to lose their entire investment. The plaintiffs argue that by becoming creditors the defendants wrongfully appropriated Cadant's value.

When a corporation is injured by a wrongful act but the board of directors refuses to seek legal relief, a shareholder

can sue the wrongdoer on behalf of the corporation. *Alabama By-Products Corp. v. Cede & Co.*, 657 A.2d 254, 265 (Del. 1995); *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993); *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 95-96 (1991); *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795, 803-04 (7th Cir. 2003); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *Stepak v. Addison*, 20 F.3d 398, 402 (11th Cir. 1994); see also *Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1245 (Del. 1999). Such a suit is known as a derivative suit, and is an asset of the corporation— which means that if, as in this case, the corporation is in bankruptcy, the suit is an asset of the bankrupt estate. 11 U.S.C. § 541(a)(1); *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1343-44 (7th Cir. 1987); *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 604 (2d Cir. 1994). As common shareholders of a bankrupt corporation, the plaintiffs very much do not want to be in bankruptcy court, where they would be entitled to nothing until all other claimants to the corporation's assets were paid in full, and so they claim to have individual rather than derivative claims against the defendants, the alleged wrongdoers.

They seek to fit their case into the familiar framework of a suit by a minority shareholder against a majority share-holder. The latter has a fiduciary obligation to the former. *Kahn v. Lynch Communication Systems, Inc*, 638 A.2d 1110, 1113-14 (Del. 1994); *In re MAXXAM, Inc.*, 659 A.2d 760, 771 (Del. Ch. 1995); *Southern Pacific Co. v. Bogert*, 250 U.S. 483, 487-88 (1919); *Pepper v. Litton, supra*, 308 U.S. at 306-07; *In re Lifschultz Fast Freight*, 132 F.3d 339, 344 n. 2 (7th Cir. 1997); *Rademeyer v. Farris*, 284 F.3d 833, 837 (8th Cir. 2002). The breach of that obligation is a wrong to the minority shareholder rather than to the corporation, since, at least as a first approximation, all it does is redistribute wealth from him to the majority shareholder; it does not reduce the value

of the corporation. To force the minority shareholder's suit into the derivative mold would have the paradoxical result that the majority shareholder would be the main beneficiary of any judgment or settlement that resulted from the suit; he would be on both sides of the litigation. But that is not this case.

The question whether a suit is derivative by nature or may be brought by a shareholder in his own right is governed by the law of the state of incorporation, *Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 159 (7th Cir. 1996); *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir. 1990); *7547 Corp. v. Parker & Parsley Development Partners*, 38 F.3d 211, 220-21 (5th Cir. 1994), in this case Delaware. The plaintiffs complain about Cadant's having been reincorporated in Delaware, but that is immaterial so far as the law applicable to the choice between derivative and direct suits is concerned because Maryland uses the same basic approach (albeit formulated somewhat differently) to derivative status as Delaware does. Compare *Waller v. Waller*, 49 A.2d 449, 452-53 (Md. 1946), and *Danielewicz v. Arnold*, 769 A.2d 274, 284 (Md. App. 2001), with *Kramer v. Western Pacific Industries, Inc.*, 546 A.2d 348, 351 (Del. 1988), and *Moran v. Household International, Inc.*, 490 A.2d 1059, 1070 (Del. Ch. 1985), aff'd, 500 A.2d 1346 (Del. 1985). It is true that *Strougo v. Bassini*, 282 F.3d 162, 171-72 n. 6 (2d Cir. 2002), conjectured that Delaware may require that the harm to the plaintiff shareholders be different from the harm to the rest of the common shareholders (the "undifferentiated harm" test) for a direct suit to lie, though no Delaware case says this. But probably all that is meant by the reference to "undifferentiated harm" is that if all the common shareholders are harmed equally, the case is unlikely to fit the majority-oppressing-the-minority pattern that allows a direct suit to be brought.

In any event the plaintiffs cannot complain about the application of Delaware law in consequence of the reincorporation of Cadant in Delaware because the very case they rely on to show they're entitled to bring a direct suit is a Delaware case. *In re Tri-Star Pictures, Inc., Litigation*, 634 A.2d 319 (Del. 1993), imposed the fiduciary obligation that a majority shareholder owes minority shareholders on a nonmajority shareholder, Coca-Cola. *Tri-Star* will not do the trick for the plaintiffs in our case, however. The extension of fiduciary duty by that decision was a modest one, as our plaintiffs' own summary of the case makes clear: "The control and domination by Coca-Cola was established by the shareholder agreements which gave it voting control over 56.6% of the outstanding stock and eight out of ten board seats." If shareholders owning in the aggregate a majority of the corporation's common stock get together and agree to use their control of the corporation to plunder the minority shareholders, the latter have suffered an individual wrong and can sue the controlling shareholders directly. See also *Rabkin v. Philip A. Hunt Chemical Corp.*, 547 A.2d 963, 969 (Del. Ch. 1986); compare *Behrens v. Aerial Communications Inc.*, 2001 WL 599870, at *3, 5 (Del. Ch.). In the case of oppression by a majority created by contract, just as in the case of oppression by a majority based on single ownership, there may have been no injury to the corporation, and therefore no occasion for the filing of a derivative suit. The more valuable a corporation is, the more valuable the control of it is. The controlling shareholders want a larger slice of the pie, not a smaller pie, though if the larger slice of a smaller pie is larger than the smaller slice of a larger pie, they will go for the former.

There are two critical differences between this case and *Tri-Star*. The first is that there was no agreement between Venrock and J.P. Morgan (nor do they have overlapping ownership or management) to control Cadant, as there was

between Coca-Cola and other shareholders, together constituting a majority, to control Tri-Star. The plaintiffs' concocted term "Venrock Affiliates" and the expression "in virtual tandem" are obfuscations intended to conceal the absence of an agreement or conspiracy, nowhere alleged in the complaint and expressly disclaimed in the plaintiffs' reply brief. Venrock and J.P. Morgan, as large investors in Cadant, had parallel interests—that much is certainly true. But if having parallel interests is enough to make investors a control group owing a fiduciary obligation to the other investors, judicial interference in the affairs of corporations will be enormously magnified. There is no legal or economic basis for extending fiduciary obligation so far.

Second, the defendants were not common shareholders at all, let alone a controlling bloc of them. The statement in the plaintiffs' opening brief that "Venrock Affiliates was a controlling shareholder who owed a fiduciary duty to the other stockholders of Cadant" is nonsense. Remember, there is no such entity, whether loose-knit or tight-knit, as "Venrock Affiliates." The defendants never exercised their warrants to purchase common stock.

If an entity that is not a common shareholder steals a corporation's assets, the corporation is the victim of the wrong and owns the cause of action against the thief. We cannot see what difference it makes whether the thief is a complete outsider or, as in this case, a preferred shareholder, who is a kind of lender, or at least quasi-lender, because on the one hand he has a specified return but on the other hand the return can be changed by the corporation and he has more authority over management than a conventional lender. See, e.g., "Preferred Stock," *Management and Technology Dictionary*, http://www.legamedia.net/lx/result/match/ 3216767669113a143fc04522d/index.php ("most people see preferred stock as debt with a tax advantage."); Lee A.

Sheppard, "Should Junk Bond Interest Deductions Be Disallowed?" 34 *Tax Notes* 1142, 1146 (1987); Bruce N. Davis & Steven R. Lainoff, "U.S. Taxation of Foreign Joint Ventures," 46 *Tax L. Rev.* 165, 219 (1991). Who steals assets of a corporation injures the corporation, and the right of redress therefore belongs to the corporation, and so the plaintiffs could not maintain this suit as a direct suit against Venrock and J.P. Morgan even if the defendants had conspired with each other to control Cadant and had succeeded in controlling it.

We would have a different case had the defendants exercised their warrants and become common shareholders. That would have diluted the voting power of the plaintiffs vis-à-vis the defendants. *Lipton v. News Int'l, Plc.*, 514 A.2d 1075, 1078-79 (Del. 1986); *Reifsnyder v. Pittsburgh Outdoor Advertising Co.*, 173 A.2d 319, 322-23 (Pa. 1961); *Avacus Partners, L.P. v. Brian*, 1990 WL 161909, at *6-7 (Del. Ch.). It would have redistributed power, and hence potentially wealth, between two groups of common shareholders, injuring one group without, once again, necessarily injuring the corporation. As *Lipton* and *Reifsnyder* put it, there would be an injury to the plaintiffs' contractual rights. There was no dilution in this case because the defendants never became common shareholders.

But although this suit thus cannot be maintained as a direct suit against Venrock and J.P. Morgan, remember that the suit is against individuals as well. Cadant's directors are accused of having issued a misleading proxy statement as a result of which the common shareholders, including the plaintiffs, were bamboozled into agreeing to the reincorporation of Cadant in Delaware, which gives shareholders less protection than Maryland does. Directors, like majority shareholders (and thus unlike Venrock or J.P. Morgan), have of course a fiduciary obligation to the shareholders. The charge that Cadant's directors issued a mis-

leading proxy statement in violation of their fiduciary obligation is a legitimate direct claim, *In re Tri-Star Pictures, Inc., Litigation, supra*, 634 A.2d at 330-32, since the effect of the reincorporation was to reduce the shareholders' power over the corporation's affairs rather than to reduce the value of the corporation. It shows by the way that a direct suit is not necessarily precluded by the common shareholders' having suffered an "undifferentiated harm." They can suffer such a harm without the corporation's being injured. A corporation might be worth as much after the directors decided that shareholders would no longer be entitled to vote on *any* matter as it had been worth before.

Only there was no fraud, at least no actionable fraud, regarding the reincorporation. The proxy statement contained more than 20 pages on the differences between Maryland and Delaware law, and specifically mentioned that certain transactions that require a supermajority in Maryland can be approved in Delaware by a simple majority. There is no actionable fraud without reasonable reliance, and reliance cannot be reasonable when it presupposes a failure to read clear language. *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544, 547 (7th Cir. 1996); *In re Mayer*, 51 F.3d 670, 676 (7th Cir. 1995); *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 416-17 (1st Cir. 1989); *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1517-19 (10th Cir. 1983).

The plaintiffs complain about other omissions from the proxy statement as well, concerning Cadant's dismal financial condition, conflicts of interest of directors, and "biographies of directors, director compensation, if any, amount of stock held by officers, directors, and 5% owners, executive compensation, related party transactions, compensation paid to officers and information regarding employment contracts." Such omissions might or might not be material. Current financial information isn't always material to the

election of directors, who after all are not responsible for the day-to-day running of the corporation (it is even less likely to be material to a decision to reincorporate in another state); and so there is no per se rule that financial information must be included in a proxy solicitation— its materiality must be demonstrated case by case. See *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997); compare *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994). Failing to mention a director's conflict of interest can make a proxy statement false and misleading, even when the directors are running unopposed, *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11 (Del. Ch. 2002), although the potential conflicts alleged here—Lyon's soon-to-be-terminated employment with J.P. Morgan, Copeland's employment with Venrock, and the fact that several directors owned preferred shares—seem pretty tepid.

As for the "biographies," contracts, and other records, we are not told what damaging information these might have revealed that should have been disclosed in the proxy statement. We cannot tell, therefore, whether there might be a viable claim buried somewhere in the quoted passage. What is more, the quotation comes from the plaintiffs' opening brief rather than from their complaint, where no such charge is made. They explain that in their brief they are merely embroidering the terse charge in the complaint that "the Defendant Venrock Affiliates and the First Venrock Bridge Affiliates [another fictitious name] breached their fiduciary duties to Cadant by . . . submitting a proxy statement to the common stockholders of Cadant containing material omissions and misstatements, for the purpose of removing control of Cadant from the common stockholders." They cite cases that permit plaintiffs to defend against dismissal by alleging in their brief facts consistent with but not contained in the complaint. *Albiero v. City of Kankakee*,

122 F.3d 417, 419 (7th Cir. 1997); *Orthmann v. Apple River Campground, Inc.,* 757 F.2d 909, 915 (7th Cir. 1985); cf. *Pegram v. Herdrich,* 530 U.S. 211, 230 n. 10 (2000); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 428 n. 8 (3d Cir. 1999). But such supplementation cannot save the charge if the charge is one of fraud, because a charge of fraud must be *pleaded* with particularity. Fed. R. Civ. P. 9(b). It is not even enough for the plaintiff to submit affidavits that particularize the complaint's charge of fraud. *Miller v. Gain Financial, Inc.,* 995 F.2d 706, 709 (7th Cir. 1993). *A fortiori* he cannot use his appeal brief to plead for the first time with the requisite particularity. The *complaint* must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir. 1990); see also *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 682 (7th Cir. 1992); *Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 524 (7th Cir. 1993); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990). "[S]ubmitting a proxy statement to the common stockholders of Cadant containing material omissions and misstatements, for the purpose of removing control of Cadant from the common stockholders" does not satisfy this standard. Elsewhere in the complaint the plaintiffs do specify the time and place of the alleged omissions and misstatements, but do not say what they were.

But in charging that the proxy statement contained material omissions and misstatements, are the plaintiffs charging fraud, and fraud alone? For if not, Rule 9(b) falls out of the picture. Plaintiffs don't *have* to charge fraud in a case such as this in order to state a claim. Negligent omission of material information from a proxy statement violates both federal securities law, see Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a); 17 C.F.R.

§ 240.14a-9; *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 29-30 n. 45 (7th Cir. 1972); *Wilson v. Great American Industries, Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *Shidler v. All American Life & Financial Corp.*, 775 F.2d 917, 926-27 (8th Cir. 1985), and Delaware law, which governs claims for breach of the fiduciary duty of disclosure by directors of Delaware corporations. *Oliver v. Boston University*, 2000 WL 1091480, at *8 (Del. Ch. 2000). Rule 9(b) is strictly construed; it applies to fraud and mistake and nothing else. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 634 (7th Cir. 2001); *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994); *In re NationsMart Corp. Securities Litigation*, 130 F.3d 309, 315 (8th Cir. 1997). And if both fraudulent and nonfraudulent conduct violating the same statute or common law doctrine is alleged, only the first allegation can be dismissed under Rule 9(b), *Lone Star Ladies Investment Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368-69 (5th Cir. 2001); *In re NationsMart Corp. Securities Litigation*, *supra*, 130 F.3d at 315, though if, while the statute or common law doctrine doesn't require proof of fraud, only a fraudulent violation is charged, failure to comply with Rule 9(b) requires dismissal of the entire charge. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-05 (9th Cir. 2003); *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 288 (3d Cir. 1992).

The complaint does not charge that the directors' failure to disclose their "biographies" and other information in records and contracts was fraudulent. Although the complaint does state that the defendants' lawyers "knew or should have known that the Proxy Statement was fraudulent and misleading," this does not necessarily mean that *all* the omissions complained of were fraudulent. In their briefs in this court, however, the plaintiffs make clear that they indeed are claiming that all the omissions were fraudulent.

For example, the omissions are discussed in a section of the plaintiffs' opening brief captioned: "The proxy [statement] was fraudulent for a host of reasons not addressed by the district court." It is apparent that if the case were to be remanded, the plaintiffs would try to prove that the omissions were fraudulent, and that they have no alternative theory of liability. If, then, the briefs are treated as amending the complaint to make clear that the omissions are being complained of solely because they were fraudulent, Rule 9(b) has been violated.

It is true that a plaintiff cannot amend his complaint in his appeal brief. *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993); *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989). But just as he might make a concession in his brief that showed that his case has no merit, though that might not have been apparent from the complaint, *Harrell v. United States*, *supra*, 13 F.3d at 235-36, so he can be estopped by statements in his appeal brief to deny the interpretation that the brief places on the complaint, if the invocation of estoppel is required for the protection of his opponent. As it is here. A principal purpose of requiring that fraud be pleaded with particularity is, by establishing this rather slight obstacle to loose charges of fraud, to protect individuals and businesses from privileged libel (privileged because it is contained in a pleading). *Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 469-70 (7th Cir. 1999); *Bankers Trust Co. v. Old Republic Ins. Co.*, *supra*, 959 F.2d at 682-83; *Vess v. Ciba-Geigy Corp. USA*, *supra*, 317 F.3d at 1104; *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1418  (3d Cir. 1997); *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990). That purpose is thwarted by the filing of a stealth complaint in which allegations of fraud are avoided only to be added later by way of brief or other filing. Such an end run should not be permitted. This conclusion is supported by *Nolan Bros., Inc. v. United States*

*for Use of Fox Bros. Construction Co.*, 266 F.2d 143, 145-46 (10th Cir. 1959), which holds that the word "fraud" need not appear in the complaint in order to trigger Rule 9(b). Cf. *Minger v. Green*, 239 F.3d 793, 800-01 (6th Cir. 2001).

Rule 9(b) does not permit us to dismiss the fraud allegations that are based on the failure of the proxy statement to disclose Cadant's financial information and directors' conflicts of interest. But those charges fall, on the merits, with the charge of fraudulent nondisclosure of the reincorporation (which we said was not fraudulent). The key allegation in the complaint against the director defendants is that they "submitted a proxy statement to the common stockholders of Cadant containing material omissions and misstatements, *for the purpose of removing control of Cadant from the common stockholders*" (emphasis added). The only "removal of control" charged is the reincorporation of Cadant in Delaware, which reduced the shareholders' control over certain transactions. As to that, the shareholders could not be deceived, because the proxy statement described the consequences of reincorporation at great length. All the other charges in the complaint involve injury to the corporation. The common shareholders were injured by that injury, but that makes their claim against the defendants, the injurers, indirect and so bars their prosecuting the claim outside of the bankruptcy proceeding.

AFFIRMED.

A true Copy:

　　　　Teste:

　　　　　　　　　　　　_____
　　　　　　　　　　　　*Clerk of the United States Court of*