**AMADEUS GLOBAL TRAVEL DISTRIBUTION, S.A. and Amadeus s.a.s., Plaintiffs,**

v.

**ORBITZ, LLC, and ITA Software, Inc. Defendant.**

**No. CIV.02–1543–SLR.**

United States District Court, D. Delaware.

Alan J. Stone, Esquire and Charles D. Reed, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Counsel for Plaintiff. J. William Koegel, Jr., Esquire and Stephen C. Bullock, Esquire of Steptoe & Johnson LLP, Washington, District of Colmbia, of Counsel.

Robert K. Payson, Esquire and Philip A. Rovner, Esquire of Potter, Anderson & Corroon LLP, Wilmington, DE, Counsel for Defendant Orbitz, LLC. David S. Foster, Esquire, Matthew W. Walch, Esquire, and Shorge K. Sato, Esquire of Latham & Watkins, Chicago, Illinois, of counsel.

Steven J. Balick, Esquire and John G. Day, Esquire, of Ashby & Geddes, Wilmington, DE, Counsel for Defendant ITA Software, Inc. Mitchell H. Kaplan, Esquire, David C. Kurtz, Esquire, and Neil P. Olson, Esquire of Choate, Hall & Stewart, Boston, Massachusetts, of Counsel.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

On October 16, 2002, Amadeus Global Travel Distribution, S.A., a *sociedad anonima* organized under the laws of the Kingdom of Spain with its principal place

of business in Madrid, Spain, and Amadeus s.a.s., *societé par actions simplifiées* organized under the laws of the Republic of France with its principal place of business in Sophia Antipolis, France (collectively "Amadeus"), filed this action against Orbitz, LLC ("Orbitz"), a Delaware limited liability company with its principal place of business in Chicago, Illinois. (D.I.1) The original complaint alleged claims for breach of contract and intentional interference with contractual relations. (D.I.1) On February 19, 2003, Amadeus filed a second amended complaint, adding ITA Software, Inc. ("ITA"), a Delaware corporation with its principal place of business in Boston, Massachusetts, as a defendant, alleging claims for breach of contract and civil conspiracy. (D.I.33) ITA, in its answer, filed six counterclaims alleging both contract, tort, and antitrust claims. (D.I.37) On May 19, 2003, the court denied a motion by Amadeus to compel arbitration or to dismiss the counterclaims without prejudice, and ordered the case bifurcated. (D.I.76) Presently scheduled for trial commencing March 8, 2004, are Amadeus's claims for breach of contract against ITA and Orbitz. The court has jurisdiction over the case pursuant to 28 U.S.C. § 1332.

Before the court are the parties' cross motions for summary judgment on Amadeus's contract claims. (D.I.174, 182, 187) For the reasons stated below, the court will deny Amadeus's motion for summary judgment (D.I.174), and grant the motions of ITA and Orbitz. (D.I.182, 187)

## II. BACKGROUND

### A. The Parties

Amadeus owns and operates what is known in the travel industry as a computer reservations system ("CRS").[1] CRSs electronically control airline schedules, fares and other data needed by CRS subscribers, such as travel agencies, to identify available flight options, book reservations and issue tickets. Amadeus is one of four major CRS companies competing on a global basis for the business of both traditional and internet-based travel agencies. Amadeus's principal global competitors are Worldspan, Sabre, and Galileo. Virtually all travel agencies, whether internet or traditional, subscribe to at least one CRS to facilitate the booking and ticketing of airline travel. When a CRS is used to book and ticket airline travel, the airline will pay the CRS a booking fee which, in the case of Amadeus, constitutes a major source of revenue.

ITS is a software development company that developed software for conducting searches to identify low-priced flight itineraries meeting specific customer criteria (the "ITA Software"). In 1998, ITA and Amadeus entered into a licensing agreement granting Amadeus a perpetual license for the nonexclusive use of the ITA Software. (D.I. 23)

Orbitz is an internet-based travel agency formed by Delta Airlines, Inc. ("Delta"), Northwest Airlines, Inc. ("Northwest"), United Airlines Inc. ("United"), and Continental Airlines, Inc. ("Continental"). On May 9, 2000, American Airlines, Inc. ("American") purchased an interest in Orbitz. Each of the airlines has the right to appoint two directors to the eleven-member board of managers of Orbitz.[2] Since June 4, 2001, through its website, www.or-

---

1. Air France, Iberia and Lufthansa are the principal shareholders of Amadeus, holding 75% of the company. (D.I. 190, ex. 5 at 6)

2. In April 2002, a corporate restructuring was initiated in which the Orbitz board of managers was replaced by a single corporate manager, Orbitz, Inc. Orbitz, Inc. was formed by the airlines for the purpose of initiating a

bitz.com, Orbitz customers are able to search for, book, and purchase airline tickets. The searching function on the Orbitz system is enabled by the ITA Software. The booking and purchasing functions are performed through Worldspan.

As of February 2001, when ITA first licensed its software to Orbitz, Delta held 28% and Northwest held 14% of Orbitz. At that time, Delta also held 40% of Worldspan and Northwest held 34%. As of May 15, 2002, when the Amended ITA–Orbitz Agreement was entered into, Delta's interest in Orbitz was 18.3%, Northwest's was 15.6%, and American's was 26.17%. With respect to Worldspan, Delta held 40%, Northwest held 34%, and American held 26%. (D.I. 176 at 25)

Worldspan, while not a party to the present litigation, is integral to Amadeus's claims. Worldspan was formed in 1990 by Delta, Northwest and Trans World Airlines, Inc. ("TWA") as a limited partnership, when the airlines agreed to combine their respective reservation services and marketing companies. Prior to April 9, 2001, Delta held a 40% ownership interest in Worldspan, Northwest held 34% and TWA held 26%. (*Id.*; D.I. 178, ex. 17 at 5) On April 9, 2001, American acquired substantially all of TWA's assets, including TWA's interest in Worldspan. On June 30, 2003, America, Northwest, and Delta divested themselves of their respective interests in Worldspan.

### B. The Amadeus–ITA Agreement

On August 23, 1998, Amadeus and ITA executed a software development and license agreement (the "Amadeus–ITA Agreement"). (D.I.23) The Amadeus–ITA Agreement, entered into in conjunction with a stock purchase agreement, granted

Amadeus a nonexclusive license to use the ITA Software. The agreement provides for certain restrictions on both parties with respect to the use, licensing, and sublicensing of the ITA Software.

Section 8.1 provides in operative part that:

> No party shall license or sublicense, for the purpose of Low Fare Searching or Guaranteed Fare Pricing, any [ITA] Software, any patents licensed hereunder or any ITA Patent Rights in [ITA] Software to, sell Transactions to or otherwise perform Transactions for, or provide Low Fare Searching data processed using [ITA] Software to, any CRS or any Affiliate of a CRS or any National Distribution Company of a CRS.

(D.I.23, ¶ 8.1) The basis for count four of Amadeus's complaint is that ITA breached this provision of the Amadeus–ITA Agreement by licensing the ITA Software to Orbitz, which Amadeus contends is an affiliate of Worldspan within the meaning of the Amadeus–ITA Agreement. (D.I. 33, ¶ 62–66)

### C. The Orbitz–ITA Agreement

In February 2001, Orbitz and ITA entered into a software license agreement (D.I.184, ex. 24), subsequently amended and restated on May 15, 2002 (the "Orbitz–ITA Agreement"). (*Id.*, ex. 27) Included in the agreement is unambiguous language restricting the use of the ITA Software (the "CRS Prohibtion") stating:

> Neither Licensee nor any Affiliate . . . shall (i) license or sublicense the Licensed Software, for Low Fare Searching or Guaranteed Fare Pricing . . . to any CRS Entity . . . (ii) sell Transactions . . . to or otherwise perform Trans-

---

public stock offering. Under its corporate bylaws, each of the airlines, as exclusive holders of the class B stock, retains the power to appoint two of the eleven members of the Orbitz, Inc. board of directors.

actions for any CRS Entity, or (iii) provide Low Fare Searching data processed using the Licensed Software to or for any CRS entity.

(D.I.188, ex. B) Pursuant to its rights as an express third party beneficiary under the Orbitz–ITA Agreement, Amadeus asserts that Orbitz' travel sales process violates the CRS Prohibition by providing Low Fare Searching data processed using ITA Software to Worldspan.

## D. Orbitz Travel Sales Process

The Orbitz travel sales process begins when an Orbitz customer via the internet submits a trip request to Orbitz. In that trip request the customer identifies certain search parameters such as originating city, destination, and dates of travel. (D.I. 176 at 16) Orbitz translates the customer's request into XML, a computer language, which is submitted to the ITA Software for processing. The ITA Software, which operates on an Orbitz computer, will search millions of possible flight and fare combinations, determine all possible routes with available seats on the given dates, and produce a set of itineraries.[3] (*Id.*)

Orbitz displays the itineraries identified by the ITA Software to its customer who, using a matrix function, may sort and arrange the flights according to cost, flight duration, specific airlines, number of connections, etc. The customer may then select a single itinerary for booking. Orbitz, using the DIR computer language, transmits the single selected itinerary, consisting of the flight numbers and travel dates, to Worldspan.[4] Worldspan will confirm flight availability and provide a final price quotation for the customer. Orbitz provides that response to the customer for acceptance and purchase. Finally, Orbitz transmits the booking information to Worldspan to complete the transaction.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a

---

3. It is possible that as many as 250 unique itineraries will be selected and produced by the ITA Software.

4. It is this step in the Orbitz travel sales process that Amadeus contends violates the CRS Prohibition.

jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

■ The parties agree, with respect to both counts, that there are no disputed material facts. Each party contends that the issues before the court on their respective summary judgment motions are matters of contract interpretation and that the contract language at issue is unambiguous. (D.I. 176 at 34; D.I. 183 at 17; D.I. 188 at 2) *See E.I. du Pont de Nemours v. Admiral Ins. Co.,* 711 A.2d 45, 56 (Del.Super.1995). Both contracts at issue contain a Delaware choice of law provision. (D.I. 23, § 19.9; D.I. 184, ex. 27, § 19(d)) In Delaware, the interpretation of contracts is a matter of law for the court to determine. *See Rhone–Poulenc Basic Chem. Co. v. American Mot. Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992).

### A. Count One

The issue before the court, with respect to count one, is whether Orbitz in an affiliate of a CRS, within the meaning of the Amadeus–ITA Agreement. As discussed above, the Amadeus–ITA Agreement unambiguously restricts the licensing of the ITA Software to a CRS or CRS affiliate. The agreement defines an affiliate as,

when used with respect to a specified Person, another Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

(D.I.23, ¶ 1.2) This aspect of the affiliate definition is a standard one and consistent with definitions provided in various state and federal statutes.[5] The gravamen to determining affiliate status, under the Amadeus–ITA Agreement as well as various state and federal laws, is control. The Amadeus–ITA Agreement defines control, and its correlative meanings, to be

possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

(D.I.23, ¶ 1.2)

Amadeus contends that, during the relevant period, Orbitz was under common control with Worldspan by virtue of the ownership interests that Delta, Northwest, and American had in both Orbitz and Worldspan. (D.I.33, ¶ 24–26) At no time did a single airline own a majority interest of either Orbitz or Worldspan. Amadeus has not alleged the existence of a voting agreement or conspiracy to affect collective control of either Worldspan or Orbitz. Instead, Amadeus's argument rests upon the aggregation of the equity and voting power of multiple airlines to conclude that Worldspan and Orbitz were under common control.

Amadeus asserts that the court should consider 8 Del. C. § 203(c) for guidance in the determination as to whether Orbitz and Worldspan were under common con-

---

**5.** *See, e.g.,* 7 U.S.C. § 6f(c)(1)(commodity exchanges); 11 U.S.C. § 101(2) (bankruptcy); 12 U.S.C. § 1841(k)(bank holding companies); 15 U.S.C. § 80a–2(3)(C); *and* 4 Del. C. § 101(1) (Delaware banks); 8 Del. C. § 203(c) (Delaware take-over statute); 12 Del. C. § 3312(a)(3) (fiduciary relations).

trol.[6] (D.I. 176 at 29–31) Section 203 defines control to be

> the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract or otherwise. A person who is the owner of 20% or more of the outstanding voting stock of any corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary.

8 Del. C. § 203(c)(4). Amadeus contends that due to the identical language defining "affiliate," and the similarity of the language defining "control," the court's decision should be informed by the statute's presumption of control based upon a 20% ownership interest. (D.I. 176 at 30–31) Amadeus relies for support upon a bankruptcy court decision from this district in which the bankruptcy court looked to Delaware statutory law for guidance where the contract at issued did not define "affiliate." *See In re Asian Yard Partners,* 1995 WL 1781675 (Bankr.D.Del. Sept.18, 1995).

This court does not agree that section 203 is relevant to the present case. First, contrary to *In re Asian Yard Partners,* the parties have provided an unambiguous definition of "affiliate." *See Ingram v. Thorpe,* 747 A.2d 545 (Del. Ch.2000). Second, § 203 on its face limits the definitions therein to that section. 8 Del. C. § 203(c) ("As used in this section only...."). Third, § 203 is directed to the regulation of corporate takeovers and expressly does not apply to closely-held entities. *Id.*

§ 203(b)(4). Indeed, in a widely-held public corporation, a 20% ownership interest may be actual control where the remaining 80% is dispersed among the investing public. That is simply not the case here in a limited liability company with five owners having similar ownership percentages. Finally, Amadeus's contention that ITA and Amadeus modeled their definition upon § 203 cuts against incorporating the statute's definition of control. Certainly, the presence of a presumption of control based upon a specified ownership interest is not uncommon. If the parties did have § 203 in mind while drafting the Amadeus–ITA Agreement and did not include a 20% control presumption, the court should not abrogate the intent of the parties by expanding the contract's express definition.

Control, under Delaware law, can not be merely hypothetical. *See Harriman v. E.I. du Pont De Nemours and Co.,* 411 F.Supp. 133, 152 (D.Del.1975) (discussing Delaware controlling shareholder liability); *Kaplan v. Centex Corp.,* 284 A.2d 119, 123 (Del.Ch.1971)("'Control' and 'domination' are here used in the ordinary meaning of the words and they may be exercised directly or through nominees. But, at minimum, the words imply (in actual exercise) a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling."). *See also In re Western Nat. Corp. Shareholders Litig.,* 2000 WL 710192, at *6 (Del.Ch. May 22, 2000)(finding that the ability of a minority shareholder to obtain a majority voting interest is insufficient to establish control). Moreover, under the Amadeus–ITA Agreement, control can not be hypothetical. The contract defines control to be the

---

**6.** Section 203(c) contains substantially identical language for the definition of "affiliate," stating that an "affiliate" is "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another person." 8 Del. C. § 203(c)(1).

"possession ... of the power to direct." (D.I.23, ¶ 1.2) Possession, of course, may be either actual or constructive and may be joint, but it must be exclusive. *See generally* Blacks Law Dictionary 1162 (6th ed.1990). In the present case, there was simply no time that control of Orbitz was exclusively held by Delta, Northwest, and American. In February 2001, when the initial Orbitz–ITA Agreement was executed, Delta and Northwest held 28% and 14% respectively. Even if there were an express agreement between the parties to exercise control over Orbitz, as a matter of law and fact they were not in control with only 42% of the vote and only four of the eleven members of the management committee in a closely-held entity. *See Kaplan,* 284 A.2d at 123.

On May 15, 2002, at the time the amended Orbitz–ITA Agreement was executed, Delta's voting interest in Orbitz had decreased to 18.3%, Northwest's interest marginally increased to 15.6%, and American had acquired 26.17% interest in Orbitz. The remaining approximate 39.93% of Orbitz was held by United and Continental. At that time, while Delta, Northwest and American could have aggregated their votes to exercise control, there is no evidence of an agreement or collective intent to do so. Moreover, at any time, Delta, Northwest or America could have voted their interest with either United, Continental or both and shift "control" of Orbitz. This cannot be reconciled with the concept of possession.

Amadeus's argument hinges upon the aggregation of the voting power of Delta, Northwest, and American, but there is no basis in precedent to support Amadeus's theory. Amadeus principally relies on two cases to support its argument, neither of which is binding or persuasive.[7] (D.I. 206 at 6–7) Moreover, Amadeus provides no relevant factual or legal basis, other than their respective holdings in Worldspan and Orbitz, as to why American, Delta and Northwestern should be considered in control of Orbitz, rather than any other combination of Orbitz owners.[8]

The Seventh Circuit Court of Appeals recently rejected a similar argument made in the context of a federal securities action. *See Kennedy v. Venrock Associates,* 348 F.3d 584 (7th Cir.2003)(deciding Delaware

7. The first case cited by Amadeus, *In re J.P. Morgan & Co,* involved an administrative law judge's consideration of whether J.P. Morgan, Inc. could serve as an indenture trustee for securities underwritten by Morgan Stanley & Co. Inc. 10 S.E.C. 119 (Sept. 19, 1941). The second principal case cited by Amadeus, *SEC v. American Beryllium & Oil Corp.,* concerned the issue of whether certain persons were part of a "control group" for purposes of 15 U.S.C. § 77b(11) and § 77e, which governs secondary distributions of unregistered stock. 303 F.Supp. 912 (S.D.N.Y.1969). In both cases, the courts considered control in the context of complex federal statutory frameworks and in both cases the courts recognized that determinations of control were fact intensive.

8. Other facts indicating control cited by Amadeus include: (1) minutes from Orbitz Board meetings that show Delta, Northwestern, and American voted together on most votes between June 1, 2000 and March 17, 2003; (2) statements by Orbitz to the SEC regarding the role of the airlines; (3) the intent of the airlines to qualify under the NASDAQ's controlled company exception; (4) statements by Orbitz to the SEC that suggested Worldspan may be a "related party;" (5) findings of the Inspector General of the U.S. Department of Transportation; (6) statements by Northwest in SEC filings referring to Worldspan and Orbitz as "affiliates;" and (7) statements by Worldspan in publicly available documents that Delta, Northwestern and American were Worldspan affiliates. (D.I. 176 at 18–32) The court finds that none of the factors are probative of whether Delta, Northwestern and American possessed actual control over Orbitz within the meaning of the Amadeus–ITA Agreement.

law). In *Kennedy,* shareholders brought suit under federal securities law charging that the defendants had banded together to plunder the corporation in violation of their fiduciary duties as controlling shareholders. The *Kennedy* plaintiffs characterized the defendants as the "Venrock Affiliates," even though no such entity existed. The defendants, in that case, neither had overlapping ownership, shared management, nor a collateral agreement between them to control the corporation. The Seventh Circuit affirmed the dismissal of the complaint, stating that the defendants "as large investors in [the corporation] had parallel interests . . . But if having parallel interests is enough to make investors a control group . . . judicial interference in the affairs of corporations would be enormously magnified." *Id.* at 591. This court agrees, and in the absence of either an agreement or a modicum of consanguinity between Orbitz shareholders, shareholders are presumed to be several and may not be compounded.

■ Amadeus disputes that an affiliate, under the Amadeus–ITA Agreement, requires actual direction of corporate affairs. (D.I. 206 at 7) This, Amadeus asserts, supplants the contract requirement that there simply be the power to control, and not the exercise thereof. (*Id.*) The court disagrees. It is axiomatic that any conceivable majority of shareholders in the aggregate holds the hypothetical power to direct or control the corporate entity. Delaware law and the Amadeus–ITA Agreement require that control be actual. The court concludes that with respect to Orbitz there is no basis to conclude that it was under the joint control of American, Delta, and Northwestern where their interests are legally distinct. Consequently, the court finds that Orbitz was not an affiliate of Worldspan and, therefore, ITA did not breach the Amadeus–ITA Agreement by entering into a licensing agreement with Orbitz.

## B. Count Four

Count four of the Amadeus complaint alleges a breach of contract claim against Orbitz arising from the Orbitz–ITA Agreement. Asserting its rights as a express third-party beneficiary, Amadeus argues that the Orbitz travel sales process violates the Orbitz–ITA Agreement's CRS prohibition against "provid[ing] Low Fare Searching data processed using the Licensed Software to or for any CRS Entity." [9] (D.I. 184, ex. 27 at ex. B) According to Amadeus, the offending step in the Orbitz travel sales process occurs when the Orbitz customer selects a single travel itinerary which Orbitz then transmits to Worldspan to confirm flight availability and fare price. Amadeus contends that this single customer selected travel itinerary constitutes Low Fare Searching data.

The Orbitz–ITA Agreement defines "Low Fare Searching" as

the capability for retrieving flight information and selecting flights (which may or may not include flight connections) optimized for cost based on, among other things, one or more of the following: travel origin, travel destination, travel date, and/or class of service.

(*Id.*) "Low Fare Searching data" is not a defined term in either the relevant CRS Prohibition or in the Orbitz–ITA Agreement. Amadeus contends that Low Fare

---

9. In addition to the restriction at issue here, Orbitz is also prohibited from "licens[ing] or sublicens[ing] the [ITA] Software, for Low Fare Searching or Guaranteed Fare Pricing . . . to any CRS Entity" and from "sell[ing] Transactions . . . or otherwise perform[ing] Transactions for any CRS Entity." (D.I.188, ex. B) "Transactions" is defined as "an individual Low Fare Searching query to the Licensed Software." (*Id.*)

Searching is process and that Low Fare Searching data is "the information generated by or resulting from [that] process." (D.I. 176 at 36) In contrast, Orbitz argues that " 'Low Fare Searching data' must be data that would give another party the 'capability' of doing what the ITA software does ... but without directly giving that party the software or operating the software on the party's behalf." (D.I. 188 at 19–20)

 The court finds that transmitting a single user selected travel itinerary to Worldspan does not constitute providing Low Fare Searching data processed using the ITA Software. First, the restriction clearly qualifies the type of data that may not be provided to a CRS as "Low Fare Searching data." If it were the intent of the parties to restrict the provision of all data generated by the ITA Software, than this express qualification would be redundant.[10] In construing contract language, redundancies should be avoided. *See E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 61 (Del.Super.1995). Consequently, the presence of the Low Fare Searching qualifier must narrow the scope of data restricted by the CRS Prohibition. Low Fare Searching, under the Orbitz–ITA Agreement, contains an express functional element: the "capability for retrieving flight information and selecting flights ... optimized for cost." (D.I. 188, ex. B) Accordingly, the court finds that the CRS Prohibition must be interpreted to restrict providing data which has at least some form of the expressed functional element. In the present case, a single user selected travel itinerary does not satisfy this definition of Low Fare Searching data.

The court's interpretation is supported by the structure and substance of the first restriction contained in the CRS Prohibition. The first restriction contained in the CRS Prohibition precludes licensing the ITA Software to a CRS Entity for the purpose of Guaranteed Fare Pricing, which is defined as "committing to a final price with one or more travel service providers for one or more bookings, including all taxes, fees, and other charges." (D.I. 188, ex. B) It is unclear what need there would be to specifically exclude Guaranteed Fare Pricing in the first restriction if Low Fare Searching data were to be given the meaning that Amadeus asserts. Moreover, had it been the parties' intent, with respect to the third restriction, then including "for the purpose of Guaranteed Fare Pricing" into the data restriction would have more simply achieved that result.

This interpretation of the contract is further supported by the fact that, if the CRS Prohibition were given the meaning that Amadeus suggests, the actual effect would be that the ITA Software would only have value to a licensee if it were an Amadeus subscriber. Certainly, it may have been the intent of Amadeus to achieve that result by investing in ITA. Amadeus's subjective intent, however, is extrinsic and irrelevant to the contract between ITA and Orbitz.[11] Moreover, that intent could have been better achieved through express language requiring that ITA licensees subscribe to Amadeus. It

---

10. It is, in fact, Amadeus's position that any data generated by the ITA Software is subject to the restriction. In its brief, Amadeus states "the three parts of the CRS Prohibition are manifestly intended ... [to proscribe] a licensee from providing **any** of the data generated by the [ITA] Software to a CRS other than Amadeus." (D.I. 176 at 35) (emphasis in original)

11. If relevant at all, Amadeus's subjective intent might be relevant to claims against ITA, something not at issue in count four.

would be illogical and unparsimonious to give the contract a meaning that could have been more simply stated.

Amadeus contends that requiring the term Low Fare Searching data to have a functional element is an implausible interpretation. (D.I. 201 at 4) According to Amadeus, the ITA Software does not generate an output with that capability and any data output would not be enabled in the absence of the ITA Software. Amadeus's argument appears to rest substantially on an over broad construction of the functional qualification and ignores the fact that Orbitz retains substantial amounts of processed data in a cache for the purpose of performing an independent fare search. (D.I. 201 at 3 n. 3; D.I. 191, ex. 13 at 187–213)

Amadeus also contends that the Orbitz interpretation of Low Fare Searching data conflicts with the language contained in the Amadeus–ITA Agreement. (D.I. 206 at 20) The Amadeus–ITA Agreement, however, is a separate and distinct contract which, as a matter of law, is irrelevant to the interpretation of the Orbitz–ITA Agreement. This is not the case where there are a series of agreements entered into as part of either a single transaction or even a series of transactions. *See E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1114–15 (Del.1985). Moreover, the Orbitz–ITA Agreement contains a valid merger clause precluding the consideration of extraneous agreements where the parties agree the language is unambiguous. *See SI Management L.P. v. Wininger*, 707 A.2d 37, 43 n. 20 (Del. 1998); *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997).

Finally, Amadeus argues that construing the CRS Prohibition not to preclude the transmittal of a single user selected travel itinerary would render the third restriction meaningless and redundant in light of the restriction against selling or performing transactions on behalf of a CRS. (D.I. 195 at 15) The restriction against selling or performing transactions, however, precludes Low Fare Searching queries initiated by or on behalf of a CRS. In contrast, the Low Fare Searching data restriction precludes providing data outputted from the ITA Software which has Low Fare Searching capability.

In summary, the court concludes that the CRS Prohibition contained in the Orbitz–ITA Agreement does not preclude the transmittal by Orbitz of a single user selected travel itinerary to Worldspan and, therefore, Orbitz is not in breach.[12]

## V. CONCLUSION

Having concluded that ITA did not breach the Amadeus–ITA Agreement and that Orbitz did not breach the Orbitz–ITA Agreement, the court will grant summary judgment to defendants ITA and Orbitz and against plaintiff Amadeus as to count one and count four. An order consistent with this opinion shall issue.

---

**12.** Having so concluded, the court need not consider defendant's motion for summary judgment as to its equitable or damages defenses.