**ALL ENERGY CORPORATION,**
Plaintiff,

v.

**ENERGETIX, LLC; Energetix Holdings II, LLC; and Mitch Miller, Defendants.**

**No. 4:11–CV–00617–JEG.**

United States District Court,
S.D. Iowa,
Central Division.

Nov. 14, 2012.

J. Mark Brewer, Sondra Jones, Jurica Brewer & Pritchard, P.C., Houston, TX, Jonathan M. Gallagher, Sean P. Moore, Brian P. Rickert, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, John David Hartung, Bradley Philip Schroeder, Hartung & Schroeder, Des Moines, IA, for Plaintiff.

Sarah Elizabeth Crane, Joseph A. Happe, Stanley J. Thompson, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, Chief Judge.

Now before the Court are Motions to Dismiss for lack of personal jurisdiction and failure to state a claim and a Motion to Strike brought by Defendants Energetix Holdings II, LLC (Holdings), and Mitch Miller (Miller). Plaintiff All Energy Corporation f/k/a All Fuels and Energy Company (All Energy) resists. No party has

requested a hearing, and the Court finds that none is required. The matter is now fully submitted and ready for disposition.

## I. BACKGROUND [1]

All Energy, a Delaware corporation with its principal place of business in Iowa, is engaged in the business of developing ethanol production facilities. Defendant Energetix, LLC, an Indiana limited liability company with its principal place of business in Michigan, is engaged in the biofuels industry. Holdings, of whom All Energy contends Energetix, LLC, is a subsidiary, is an authorized limited liability holding company in Indiana.[2]

On July 7, 2011, All Energy entered into a Non–Disclosure Agreement (NDA) also signed by Miller, a Michigan resident, manager of Energetix, LLC, and member of both Energetix, LLC, and Holdings (collectively, Energetix Entities). The NDA pertains to an ethanol production plant located in Rosholt, South Dakota (Rosholt Plant), a plant All Energy identified as an acquisition target in 2008. In preparation for its acquisition, All Energy's CEO and president, Dean Sukowatey (Sukowatey), and All Energy's COO and director, James Broghammer (Broghammer), extensively investigated the Rosholt Plant including its operations, finances, and profitability. Prior to the NDA's enactment, All Energy obtained a firm and binding commitment for $5,000,000 in financing from Community Business Lenders (CBL). All Energy also assembled a team of experienced managers for the op-

---

1. When considering a 12(b)(2) motion, the Court "must look at the facts in the light most favorable to the nonmoving party and resolve all factual conflicts in favor of that party." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 646–47 (8th Cir.2003); *see also Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir.), *cert. denied*, —— U.S. ——, 131 S.Ct. 524, 178

L.Ed.2d 373 (2010) (considering a Rule 12(b)(6) motion and noting that the court "tak[es] all facts alleged in the complaint as true" (quoting *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 918 (8th Cir.2008))).

2. The Court refers to Miller, Holdings, and Energetix, LLC, collectively as Defendants.

eration of the plant consisting of Thomas Lane, Leon Anderson, Timothy Simonson, and Broghammer in March of 2011.

At the time of the NDA's execution, the Rosholt Plant was operated by United States Bankruptcy Trustee Thomas Stalnaker (Stalnaker) for the Tri–State Financial, LLC, bankruptcy estate in the United States Bankruptcy Court for the District of Nebraska (Bankruptcy Court). Stalnaker had issued, on June 30, 2011, a Notice of Abandonment indicating his intent to abandon the Rosholt Plant on July 21, 2011, if not sold.

At the July 7 meeting, in reliance on the NDA, All Energy first shared its confidential information regarding the Rosholt Plant with Miller and his brother, Mick Miller (Mick), both of whom were serving as agents for the Energetix Entities. The information shared included the plant's expected purchase price, deficiencies in the plant, capital required for repairs and maintenance, financial pro formas, lender-related materials, and confidential information received from Stalnaker. All Energy also introduced the key management personnel it had assembled. Following this meeting, on July 9, 2011, Miller authored and sent a document to All Energy containing the essential terms for the purchase of the Rosholt Plant.

Approximately one week after this initial meeting, Sukowatey met with Mick and Warren Anderson (Anderson), an attorney licensed in South Dakota, at an ethanol plant in Minnesota that is operated by the Energetix Entities and in which Holdings holds ownership interest. Though initially introduced to Sukowatey as an investor, Anderson ultimately disclosed that he represented a group of investors called the Breckenridge Group. At this meeting, which was held to further discuss the purchase of the Rosholt Plant, Miller and Jason Jerke (Jerke), another member of the Energetix Entities, participated by telephone.

Based on these communications and the NDA, the parties verbally entered into a joint venture to purchase the Rosholt Plant. The specifics of the arrangement, including the parties' respective ownership interests, management roles, and fees, were then negotiated and memorialized in a Final Term Sheet drafted and sent by Mick to Sukowatey on July 18, 2011. Pursuant to the Final Term Sheet, All Energy was responsible for providing its $5,000,000 financing commitment from CBL, and "Energetix" was to provide $4,000,000 in cash from investors it selected. Final Term Sheet ¶ 2, ECF No. 41–2. The parties also expressed their understanding that Stalnaker's authority to sell the plant expired on July 21, 2011; thus, the parties were to perform their respective obligations by July 20, 2011.

On July 19, 2011, All Energy and its attorney, Eric Newlan, participated in a telephone conference with Stalnaker, Miller, and Anderson—who then said he was appearing as counsel for Energetix, LLC, and on behalf of himself and the Breckenridge Group as investors. During the call, Stalnaker informed the parties that the Rosholt Plant's first secured creditor was meeting with another buyer. The following day, Miller wrote Sukowatey to disclose that the sought investors would not provide the requisite funds under the agreed upon ownership structure and fees; thereafter, the Energetix Entities failed to provide the promised $4,000,000. That same day, Stalnaker notified All Energy that he had entered into an agreement with another party, later identified as Red River Energy, LLC (Red River Energy), and its founders, Jack and Greg Carlisle, with whom he now was exclusively negotiating. On August 8, 2011, Red River Energy executed a Purchase Agreement for

the Rosholt Plant at an agreed purchase price of $4,500,000, which Stalnaker represented to the Bankruptcy Court as the best purchase price available. The sale was finalized on September 21, 2011, at which time Anderson held himself out as the attorney for Red River Energy. Members of All Energy's intended management team—Thomas Lane, Leon Anderson, and Timothy Simonson—were then solicited to work for and are presently employed at the Rosholt Plant.

In the fall of 2011, Energetix, LLC, entered into a short-term Cold Idle Management Agreement with Red River Energy under which it presently operates the Rosholt Plant on a month-to-month extension. All Energy asserts that both Miller brothers and Holdings also manage the Rosholt Plant and that Defendants, along with Anderson, Robert Yaggie, and Mike Yaggie of the Breckenridge Group, have ownership interest in the plant. All Energy further asserts that Defendants had an existing relationship with Red River Energy's founders, Jack and Greg Carlisle.

Based on the NDA, All Energy filed its Complaint on December 27, 2011, alleging breach of contract, breach of implied covenant of good faith and fair dealing, civil conspiracy, intentional interference with a contract, and that Defendants were unjustly enriched.

The NDA contains a forum selection clause stipulating that "[a]ll actions in connection with [the NDA] shall be brought only in the state or federal courts sitting in Des Moines, Iowa," and further provides that the NDA "shall be governed by and construed in accordance with the laws of the State of Delaware." Mutual Non–Disclosure Agreement (NDA) ¶ 14(a), ECF No. 41–1. Also included in the NDA are non-solicitation, non-circumvention, and confidential information provisions. The non-solicitation provision provides as follows:

> During the term of this Agreement and for a period of twenty four (24) [3] months thereafter, neither party hereto shall, directly or indirectly, recruit, solicit or otherwise induce or influence any person or entity which is, or was at any time during the term of this Agreement, a customer, supplier, employee, consultant, sales agent or independent contractor of the other party hereto or any other person or entity which has a business, agency or employment relationship with such other party or its affiliates to discontinue or reduce the extent of such relationship.

*Id.* ¶ 12. The parties further agreed under the non-circumvention provision that the parties would not, without the written consent of All Energy, "solicit, contact, negotiate, or form any agreements with" All Energy's "acquisition target," the Rosholt Plant. *Id.* ¶ 6. The parties also agreed to "maintain complete confidentiality regarding [All Energy's] business contacts, and w[ould] disclose such Business Sources only to named parties pursuant to the express written permission of [All Energy]." *Id.*

The NDA defines confidential information as "any and all information and documents provided by the Disclosing Party to the Receiving Party, either directly or indirectly ... unless such information has been explicitly designated by the Disclosing Party as not Confidential Information." *Id.* ¶ 1. The provision further enumerates the inclusion of "technical data, trade secrets, plans for products or services, company or supplier lists, customer lists, customer information[,] marketing plans, ...

---

**3.** The face of the agreement was manually altered by the parties on July 7, 2011, to change the agreement from twenty-four to twelve months.

[and] financial documents or data" as confidential information. *Id.* An exception in the provision allows the disclosure of confidential information "to explore a potential financing between the parties" and to a party's own personnel for the purpose of evaluating potential business relationships and otherwise carrying out the agreement, but binds said personnel to the terms of the agreement or similar confidentiality measures. *Id.*

On February 8, 2012, Miller and Holdings filed a Motion to Dismiss for failure to state a claim with attached briefing resisting Iowa's exercise of personal jurisdiction over them. In its response, All Energy noted that Miller and Holdings failed to cite Federal Rule of Civil Procedure 12(b)(2) as a basis for their motion to dismiss. On March 21, 2012, Miller and Holdings filed a single-page Amended Motion to Dismiss, which summarily listed Rule 12(b)(2) as a second basis for their motion to dismiss. No additional briefing was provided. All Energy filed a Response to Defendants' Amended Motion to Dismiss, which Miller and Holdings moved to strike, arguing that it constituted a surreply and went beyond the scope of the Amended Motion to Dismiss.

In its Response to Defendants' Motion to Dismiss, All Energy resisted the motion and simultaneously pled that, were the Court to find the Complaint lacking, it "requests leave to amend its complaint to the extent the court deems necessary." Resp. to Mot. to Dismiss 19, ECF No. 13. On June 12, 2012, the Court entered an order citing Local Rule 7(e) and instructing the parties that "[a] resistance to a motion may not include a separate motion," thus precluding consideration of All Energy's request for leave to amend as raised. June 12, 2012 Order, ECF No. 31. On July 19, 2012, All Energy filed an Amended Complaint, which Energetix,

LLC answered on August 21, 2012. *Miller* and Holdings have not responded, presumably relying upon their existing motions.

## II. DISCUSSION

### A. Preliminary Matters

The Court must first address a series of preliminary challenges and objections raised by the parties. Precipitating the parties' quibble over violations of local rules was All Energy's challenge of Miller and Holdings' failure, albeit a technical violation of Local Rule 7(d), to explicitly cite Rule 12(b)(2) in their Motion to Dismiss and attached Brief in Support. As a direct result of Miller and Holdings' imprecise filing, the Court now must dispose of these collateral issues.

#### 1. Waiver of 12(b)(2) Objection

Federal Rule of Civil Procedure 12(g)(2) states that "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Local Rule 7(b)(3) requires citation to the statute or rule under which a party brings its motion. In its Response, All Energy notes that, while substantively argued, Miller and Holdings failed to cite Rule 12(b)(2) as a basis for their Motion to Dismiss. All Energy then resisted the filing of the Amended Motion to Dismiss, in which Miller and Holdings summarily assert Rule 12(b)(2) as an additional basis for their motion, arguing that Miller and Holdings waived their right to challenge personal jurisdiction when they failed to cite the rule in their initial motion as required under Rule 12 and Local Rule 7(b)(3).

In their initial motion, Miller and Holdings moved "pursuant to Rule 12(b)(6) of the Federal Rules of Procedure" to dismiss All Energy's Complaint. Mot. to Dis-

miss, ECF No. 10. They further pled that they so moved "for the reasons stated in the accompanying Brief in Support, incorporated herein by reference." *Id.* Nearly five pages of the attached brief were dedicated to disputing Iowa's personal jurisdiction over the two defendants. As this Court has previously held, a party can comply with Local Rule 7(b)(3) when it includes citation to the applicable legal authority in its briefing and incorporates by reference the Brief in Support into its motion. *See U.S. Bank, Nat'l Ass'n v. CB Settle Inn Ltd. P'ship*, 827 F.Supp.2d 993, 997 (S.D.Iowa 2011) ("Plaintiff incorporated by reference its Brief in Support of its Motion for Appointment of Receiver, and the brief contained numerous citations to federal statutes and federal case law. Therefore, Plaintiff complied with Local Rule 7(b)(3).").

██ All Energy mistakenly relies on the unpublished district court decision *Summit Training Source, Inc. v. Mastery Technologies, Inc.*, No. 1:00–CV–127 WAM, 2000 WL 35442327 (W.D.Mich. June 1, 2000), a case at once unpersuasive and distinguishable from the present circumstances. In *Summit Training Source*, the defendants failed to mention any challenge to personal jurisdiction in their motion to dismiss and in their concurrently filed answer to the complaint. *Id.* at *3. Instead, the defendants first raised their personal jurisdiction argument in their reply brief. *Id.* Thus, the court found the challenge to be "clearly an afterthought" and waived. *Id.* Here, while the motion

and accompanying brief lack any citation to Rule 12(b)(2), the brief contains exhaustive discussion of the standard for personal jurisdiction as provided in case law binding on this Court.

Further, Local Rule 1(d) allows for modification of the Local Rules by the presiding judge, and Rule 1(f) provides that "[a] failure to comply with the Local Rules may be sanctioned by the court in any appropriate manner," thereby leaving any remedial action to the complete discretion of the Court. Miller and Holdings disputed personal jurisdiction in their initial brief, thereby putting All Energy on notice of this objection, and later filed an Amended Motion to Dismiss citing Rule 12(b)(2) to cure any pleading deficiencies. Thus, the Court finds Miller and Holdings did not waive their right to challenge personal jurisdiction.

### 2. Failure to Comply with Local Rule 7(d)

All Energy next argues that the Amended Motion to Dismiss fails to comply with Local Rule 7(d), which provides that "[f]or every motion, the moving party must prepare a brief containing a statement of the grounds for the motion and citations to the authorities upon which the moving party relies."[4] The rule requires the brief to be filed the same day as the motion and attached under the same docket entry. *Id.* Miller and Holdings failed to attach a brief with their Amended Motion to Dismiss and failed to incorporate by reference their previous motion or its briefing. Yet, that same day, they separately filed a reply to

**4.** Eight motions are exempted under Local Rule 7(d): (1) a motion to amend a scheduling order and discovery plan; (2) a motion to extent a deadline or continue a proceeding; (3) a motion seeking permission to file an over-length brief; (4) a motion for appointment of a next friend or guardian ad litem; (5) a motion to compel discovery responses; (6) a motion to substitute or withdraw coun-

sel; (7) a motion to substitute a party; and (8) a motion to amend or supplement a motion, brief, or other document. LR 7(d)(1)-(8). The parties dispute whether the Amended Motion to Dismiss constitutes a motion to amend. See LR 7(d)(8). This dispute, however, is a distraction, as regardless of the outcome, All Energy is not entitled to the remedy it requests.

their initial Motion to Dismiss. While this series of events apparently caused confusion for All Energy, it does not constitute an actionable error. Local Rule 7(d) provides that when "a brief is not filed on the same day as the motion it supports, it may be stricken by the court as untimely." However, no subsequent untimely filing occurred; thus, no remedy is available to All Energy. Further, the rule does not provide that such an error can result in the motion itself being stricken, nor does it hold any implication for the separately filed reply. As previously discussed, any action of this Court would be discretionary and, under the present circumstances, unwarranted.

### 3. Motion to Strike

Subsequent to All Energy submitting a response to the Amended Motion to Dismiss, Miller and Holdings filed a Motion to Strike Plaintiff's Response. Citing no statutory authority as a basis for their motion, Miller and Holdings allege that the Response constituted a surreply filed without leave of Court and that it impermissibly exceeded the scope of their Reply and therefore should be stricken.

 Pursuant to Rule 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." District courts enjoy considerable discretion when ruling on a motion to strike. *See Nationwide Ins. Co. v. Cent. Mo. Electric Coop., Inc.,* 278 F.3d 742, 748 (8th Cir.2001). This Court need not exercise that discretion, however, as neither a response nor a surreply to a motion constitute a pleading; thus, the Motion to Strike is an improper method by which to challenge the filing. *See Mecklenburg Farm v. Anheuser-Busch, Inc.,* 250 F.R.D. 414, 420 n. 7 (E.D.Mo.2008) ("A motion to strike is properly directed only to material contained in pleadings.... Motions, briefs, memoranda, objections or affidavits may not be attacked by a motion to strike."); *see also* Fed.R.Civ.P. 7(a) (defining a pleading as including a complaint, an answer to a complaint, an answer to a counterclaim designated as a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and a reply to an answer when ordered by the court). The Court therefore views the argument in favor of the Motion to Strike more as a challenge to the weight to be accorded the filing. *See Voice Capture, Inc. v. Intel Corp.,* 354 F.Supp.2d 997, 1007–08 (S.D.Iowa 2004) (treating a motion to strike an affidavit, which does not constitute a pleading, as a challenge to the weight accorded to the document).[5]

## B. Personal Jurisdiction Generally

### 1. 12(b)(2) Standard

 "To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff 'must state sufficient facts in the complaint to support a reasonable inference that the defendants can be subjected to jurisdiction within the state.'" *Dever v. Hentzen Coatings, Inc.,* 380 F.3d 1070, 1072 (8th Cir.2004) (internal alteration omitted) (quoting *Block Indus. v. DHJ Indus., Inc.,*

---

**5.** This Court's approach to motions to strike matters not encompassed in Rule 12(f) has been readily discernable. *See Mahony v. Universal Pediatric Servs., Inc.,* 753 F.Supp.2d 839, 844 n. 3 (S.D.Iowa 2010); *Aurora Nat'l Life Assurance Co. v. Harrison,* 462 F.Supp.2d 951, 953 n. 1 (S.D.Iowa 2006); *Napreljac v. John Q. Hammons Hotels, Inc.,* 461 F.Supp.2d 981, 1044 n. 37 (S.D.Iowa 2006); *Wilson v. City of Des Moines,* 338 F.Supp.2d 1008, 1023 n. 19 (S.D.Iowa 2004); *Milk Drivers, Dairy & Ice Cream Employees, Laundry & Dry Cleaning Drivers, Clerical & Allied Workers, Local Union No. 387 v. Roberts Dairy,* 219 F.R.D. 151, 152–53 (S.D.Iowa 2003).

495 F.2d 256, 259 (8th Cir.1974)). "Once jurisdiction has been controverted or denied, the plaintiff has the burden of proving such facts." *Id.* (internal alterations omitted) (quoting *Block Indus.*, 495 F.2d at 259). Nevertheless, the Court "must view the evidence in the light most favorable to [the non-moving party] and resolve factual conflicts in its favor." *Romak USA, Inc. v. Rich*, 384 F.3d 979, 983 (8th Cir.2004).

■ In a diversity case, as here, the Court "may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." *Id.* at 984 (quoting *Dever*, 380 F.3d at 1073). "Because Iowa's long-arm statute 'expands Iowa's jurisdictional reach to the widest due process parameters allowed by the United States Constitution,' [the Court's] inquiry is limited to whether the exercise of personal jurisdiction comports with due process." *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir.2010) (quoting *Hammond v. Fla. Asset Fin. Corp.*, 695 N.W.2d 1, 5 (Iowa 2005)).

■ "The touchstone of the due-process analysis remains whether the defendant[s] ha[ve] sufficient minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Viasystems, Inc. v. EBM–Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir.2011) (third alteration in original) (citation and internal quotation marks omitted). "The defendant[s] must have engaged in 'some act by which the defendant[s] purposefully avail[ ] [themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir.2011) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). "This purposeful-availment requirement is met where the 'defendant[s'] conduct and connection with the forum State are such that [they] should reasonably anticipate being haled into court there.'" *Id.* (quoting *Burger King*, 471 U.S. at 474, 105 S.Ct. 2174).

■ "The minimum contacts necessary for due process may be the basis for either 'general' or 'specific' jurisdiction." *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir.2011) (quoting *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir.2010)). "A court obtains general jurisdiction 'against [ ] defendant[s] who ha[ve] continuous and systematic contacts with the forum state, even if the injuries at issue in the lawsuit did not arise out of the defendant[s'] activities directed at the forum.'" *Johnson*, 614 F.3d at 794 (internal quotation marks omitted) (quoting *Dever*, 380 F.3d at 1073). "[S]pecific jurisdiction requires that the cause of action arise from or relate to [the] defendant[s'] actions within the forum state." *Wells Dairy*, 607 F.3d at 518.

■ The Eighth Circuit has enumerated five factors that a court must consider when determining whether the requisite minimum contacts exist:

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of [the forum state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties.

*K–V Pharm.*, 648 F.3d at 592 (alteration in original) (quoting *Johnson*, 614 F.3d at 794). While "[s]ignificant weight is given to the first three factors," *Dever*, 380 F.3d at 1074, the Court must "look at all of the

factors and the totality of the circumstances in deciding whether personal jurisdiction exists." *K–V Pharm.*, 648 F.3d at 592–93.

## 2. The Forum Selection Clause

■ All Energy argues that under the NDA, Defendants have waived any objection to personal jurisdiction. The NDA provides that "[a]ll actions in connection with [the NDA] shall be brought only in the state or federal courts sitting in Des Moines, Iowa." NDA ¶ 14(a), ECF No. 41–1. "[I]t is settled ... that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether." *Wells Fargo Fin. Leasing, Inc. v. NCH Healthcare Sys., Inc.*, 756 F.Supp.2d 1086, 1092 (S.D.Iowa 2010) (alterations in original) (quoting *EFCO Corp. v. Norman Highway Constructors, Inc.*, 606 N.W.2d 297, 299 (Iowa 2000)). Thus, "[f]orum selection clauses can constitute sufficient consent by [ ] nonresident defendant[s] to the exercise of personal jurisdiction by a foreign court." *Liberty Bank, F.S.B. v. Best Litho, Inc.*, 737 N.W.2d 312, 315 (Iowa Ct.App.2007) (citing *Norman Highway Constructors*, 606 N.W.2d at 299); *see also St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 624 (8th Cir.2001) ("Due process is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause." (quoting *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 726 (8th Cir.2001))); *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F.Supp.2d 423, 431 (D.Del.1999) ("It is well settled that a party can consent to the personal jurisdiction of a court.... The use of a forum

selection clause is an example of an express consent to personal jurisdiction.").

### i. Standard Under Delaware Law [6]

■ To determine whether Miller and Holdings are subject to the forum selection clause, the Court must address three concerns: "(1) whether the forum selection clause is valid; (2) whether [Miller and Holdings] are either parties, third-party beneficiaries, or closely related to the [NDA]; and (3) whether the present claim arises from their standing relating to the [NDA]." *Hadley v. Shaffer*, No. Civ.A. 99–144–JJF, 2003 WL 21960406, at *4 (D.Del. Aug. 12, 2003); *see also Weygandt v. Weco, LLC*, C.A. No. 4056–VCS, 2009 WL 1351808, at *4 (Del.Ch. May 14, 2009) (same). In making this determination, the Court must interpret the NDA subject to Delaware contract interpretation principles.

■ "In Delaware, the interpretation of contracts is a matter of law for the court to determine." *Amadeus Global Travel Distrib., S.A. v. Orbitz, LLC*, 302 F.Supp.2d 329, 334 (D.Del.2004) (citing *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992)). "When interpreting a contract, the role of a court is to effectuate the parties' intent. In doings so, [the court is] constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "Clear and unambiguous language should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it."

---

**6.** The parties do not dispute that, for the purpose of interpreting the contract, Delaware law applies.

*Id.* (alteration omitted) (quoting *Rhone–Poulenc,* 616 A.2d at 1195). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.* (quoting *Rhone–Poulenc,* 616 A.2d at 1196). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* (quoting *Rhone–Poulenc,* 616 A.2d at 1196).

In the present case, neither party disputes the validity of the forum selection clause nor do they contest that the claims arise from the NDA; thus, the Court employs the above principles when considering whether Holdings and Miller are parties to, affiliates of, or closely related to the NDA.

### ii. Holdings

#### a. Holdings as a Direct Party to the NDA

"[T]he ordinary rule is that only the formal parties to a contract are bound by its terms." *Alliance Data Sys. Corp. v. Blackstone Capital Partners V.L.P.,* 963 A.2d 746, 760 (Del.Ch.2009). Here, as alleged by All Energy, Miller, as a member and agent, had the authority to bind both Energetix Entities. While Miller and the Energetix Entities now argue that only Energetix, LLC, was intended to be bound, there is nothing in the contract to support this contention; instead, Defendants wholly rely on their own self-serving assertions to bolster their claim. The contract fails to specify by name who is being bound beyond All Energy. The only reference to the Energetix Entities in the NDA is the generic name "Energetix," NDA 4, ECF No. 41–1, which fails to clarify whether Energetix, LLC, Holdings, or both were intended to be bound. Further, Miller indicated in an email to a lending institution that Holdings was the entity in which the ownership interest in the Rosholt Plant would be placed. Miller July 18, 2011 Email, ECF No. 13–2. Holdings does not contend it was unaware of this communication by its agent and yet it took no measures to distance itself from the transaction. *See Brittingham v. Bd. of Adjustment of Rehoboth Beach,* No. Civ.A. 03A–08–002, 2005 WL 170690, at *5–6 (Del.Super.Ct. Jan. 14, 2005) ("Silence also manifests consent in some contract cases.... [I]n all of the cases where silence is said to impute consent there lies a common thread. Circumstances arose in which a party would naturally have been expected to object or to speak out but did not. Because of the lack of objection it appeared to all parties present that the silent party assented to what was being said or done."). Further, the very nature of the agreement, which was entered into to protect the confidential nature of a potential business transaction and the involved proprietary information, would be inherently flawed if it did not restrict all involved parties, for to exempt one party directly involved in the transaction would render the agreement nearly useless. As alleged by All Energy, the joint venture was negotiated with all of Holdings' owners, part of the negotiation occurred at a plant in which Holdings has ownership, the NDA was signed by Holdings' agent, and that same agent indicated that any ownership of the Rosholt Plant would be held by Holdings. Given the purpose of the agreement and the involvement of the parties, the Court finds Holdings is bound as a direct party to the NDA.

#### b. Holdings as an Affiliate of Energetix, LLC

Even if Holdings were not a direct party to the NDA, the Court finds Holdings would be bound by the NDA's terms

as an affiliate of Energetix, LLC. While the NDA does not define "affiliate," it is generally understood to mean "when used with respect to a specified Person, another Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified." *Amadeus Global Travel Distrib.*, 302 F.Supp.2d at 334 (adopting the above definition from the agreement under consideration and noting its consistency with definitions provided in various state and federal statutes); *Universal Studios Inc. v. Viacom Inc.*, 705 A.2d 579, 589 (Del.Ch.1997) (noting the agreement defined "Affiliate" as "any corporation or business association which, directly or indirectly, is controlled by, is in control of or is under common control with the the [sic] corporation or business association with reference to which the term 'Affiliate' is used" (alteration in original)); *see also* 8 Del. C. § 203(c)(1) (" 'Affiliate' means a person that directly, or indirectly through 1 or more intermediaries, controls, or is controlled by, or is under common control with, another person.").

In *Amadeus Global Travel Distribution, S.A. v. Orbitz, LLC,* 302 F.Supp.2d at 334, the issue before the court was whether Orbitz qualified as an "affiliate" of another company. The court found "[t]he gravamen to determining affiliate status, under the [relevant agreement] as well as various state and federal laws, is control," which the agreement defined as "possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise)." *Id.* The plaintiff, in its attempt to show common control between defendant Orbitz and a third-party company, Worldspan, noted that three companies held common ownership in both Orbitz and Worldspan. *Id.* The court, while noting that at no time did

one of the three companies own a majority interest in either Orbits or Worldspan, nor was a voting agreement or conspiracy alleged, found control was never established. *Id.* at 334–37.

■ Here, in contrast to *Orbitz,* the requisite control existed. Both Miller brothers attended the meeting at which the NDA was signed and Jerke took part in the negotiation of the specifics pertaining to the Rosholt Plant purchase. In his affidavit, Miller admits that Energetix, LLC, and Holdings are commonly owned by Mick, Jerke, and himself. Miller Aff. ¶ 16, ECF No. 10–2. There is no indication that any separate body controls Holdings. Further, there is no indication that Holdings was excluded as an affiliate; instead, Holdings is explicitly mentioned in the course of the parties' dealings. Thus, here, control was not hypothetical, it was actual, joint, and exclusive. *See id.* at 335–36 ("Control, under Delaware law, can not be merely hypothetical.... Possession, of course, may be either actual or constructive and may be joint, but it must be exclusive.").

■ The NDA's acknowledgment that the signatory "may disclose Confidential Information only to its directors, officers, *affiliates,* employees, members, [and] partners ... *who are bound by the terms hereof or similar confidentiality obligations,*" further accommodates that nonsignatory parties could become bound by the agreement. NDA ¶ 1, ECF No. 41–1 (emphasis added). Holdings received the confidential information, involved itself in the affairs of the NDA by contacting an Iowa loan office through its part-owner and agent Miller, sent its own financial information and expressed its intention to hold ownership in the Rosholt Plant through that same agent, and ultimately benefitted from that information by now

purportedly managing and partially owning the Rosholt Plant. Accordingly, this Court finds Holdings bound as an affiliate of Energetix, LLC. *See Universal Studios,* 705 A.2d at 589 (finding Viacom International was an affiliate of Paramount, and therefore subject to the non-compete clause signed by Paramount, when, in part, the two entities were under the common control of the defendant corporation, Viacom Inc.).[7]

#### c. Holdings as a Closely Related Party to the NDA

 "There are two ways that an entity can be closely related to an agreement: (1) it receives a direct monetary or non-monetary benefit from the agreement;

or (2) it was foreseeable that the entity would be bound by the agreement." *Eastman Chem. Co. v. AlphaPet Inc.,* Civ. Action No. 09–971–LPS–CJB, 2011 WL 6004079, at *9 (D.Del. Nov. 4, 2011) (citing *Baker v. Impact Holding, Inc.,* Civil Action No. 4960–VCP, 2010 WL 1931032, at *4 (Del.Ch. May 13, 2010)); *see also Weygandt,* 2009 WL 1351808, at *4 (same); *Hadley,* 2003 WL 21960406, at *6 ("Forum selection clauses bind nonsignatories that are closely related to the contractual relation or that should have foreseen governance by the clause." (citation and internal quotation marks omitted)). "While a court must look to the intentions of the contracting parties under the third-party-beneficia-

---

7. The parties also dispute whether Holdings is bound as a third-party beneficiary of the NDA.

> Under Delaware law ... to qualify as a third party beneficiary of a contract, (a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift in satisfaction of a preexisting obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.

> *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 196 (3d Cir.2001); *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378, 1386 (Del.Super.Ct.1990) ("In order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose.").

> Holdings was not identified in the NDA or by the parties as receiving a benefit in satisfaction for some existing debt or obligation and, while Miller later mentioned in an email that Holdings likely would hold the ownership interest, there is no indicium that this was the parties' intent at the time they entered into the NDA. *See Eastman Chem. Co. v.*

*AlphaPet Inc.,* Civ. Action No. 09–971–LPS–CJB, 2011 WL 6004079, at *8 (D.Del. Nov. 4, 2011) (finding a non-signatory defendant did not qualify as a third-party beneficiary when there was no indication that the agreement was entered into "in satisfaction of a preexisting obligation" to the non-signatory defendant nor that a "material part of the parties' purpose in entering into" the agreement was to benefit the non-signatory defendant); *see also E.I. DuPont,* 269 F.3d at 196–97 (finding that a parent company did not qualify as a third-party beneficiary simply because it would benefit from the contract into which its subsidiary had entered). Further, there is no indication that Holdings previously invoked a provision of the NDA, no direct benefit was contemplated at the time the NDA was signed, and no approval by Holdings was explicitly required in the agreement. *See Hadley v. Shaffer,* No. Civ.A. 99–144–JJF, 2003 WL 21960406, at *5 (D.Del. Aug. 12, 2003) (finding the non-signatory plaintiffs were third-party beneficiaries when they had invoked the forum selection clause in previous litigation and were majority shareholders that were intended to benefit from the agreement as they were repeatedly mentioned in the agreement, were entitled to receive payments pursuant to the agreement, and had approved the agreement in their capacity as shareholders). The Court finds the record inadequate to reach this essentially unnecessary determination and makes no finding whether Holdings is a third-party beneficiary.

ry theory, when examining whether a person is 'closely related' to a contract, the court generally looks instead to the parties' conduct after the contract was executed." *AlphaPet Inc.*, 2011 WL 6004079, at *9 (citing *Capital Group Cos. v. Armour*, No. Civ.A. 422–N, 2004 WL 2521295, at *6 n. 40 (Del.Ch. Nov. 3, 2004)).

 "In general, a non-signatory is estopped from refusing to comply with a forum selection clause when [it] received a direct benefit from a contract containing a forum selection clause." *Capital Group*, 2004 WL 2521295, at *6 (citation and internal quotation marks omitted). In *Capital Group*, a closely held company allowed its employee to transfer stock that was subject to a Stock Restriction Agreement (SRA) containing a forum selection clause to a joint trust created for the benefit of the employee and his wife. *Id.* at *1. When the couple filed for divorce, the closely held company brought suit seeking to enforce the SRA and prevent the transfer of stock; the wife filed a motion to dismiss for lack of personal jurisdiction alleging that the forum selection clause did not apply to her. *Id.* at *2. The court held, in relevant part, that the wife, who benefitted from the stock transfer, was bound by the forum selection clause when sued individually by the company regardless of whether she was a party to the SRA as the benefit she received would not have occurred without the SRA. *Id.* at *5–7.

 As alleged by All Energy, Holdings has directly benefitted from the NDA, regardless of its status as party to the NDA. Based upon the agreement, Holdings, through its owners and agents, received confidential information from All Energy about the Rosholt Plant. *See Baker*, 2010 WL 1931032, at *4 ("[A] benefit need not be pecuniary to constitute a direct benefit."). Further, in reliance on the NDA, All Energy introduced Holdings,

through its owners and agents, to the personnel now running the plant that Holdings partially manages. Thus, Holdings received a direct benefit under the NDA as the very information the NDA was meant to protect enabled Holdings' acquisition of, ownership in, and present management of the Rosholt Plant. *See Am. Bureau of Shipping v. Tencara Shipyard, S.P.A.*, 170 F.3d 349, 352–53 (2d Cir.1999) (finding a ship purchaser bound by a forum selection clause contained in an agreement to certify a ship entered into by the ship's builder and the certification organization, when the purchaser brought suit against the organization for improper certification after having obtained lower insurance rates based on that certification); *Baker*, 2010 WL 1931032, at *4 (finding "a right to a seat on the board of directors" was "sufficient to constitute a direct benefit to [the defendant]").

Moreover, the Court finds a close relationship based on foreseeability. "Several cases suggest that when a control person agrees to a forum, it is foreseeable that the entities controlled by that person which are involved in the deal will also be bound to that forum." *Weygandt*, 2009 WL 1351808, at *5; *see also Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 210 (7th Cir.1993); *Jordan v. SEI Corp.*, No. CIV. A 96–1616, 1996 WL 296540, at *6 (E.D.Pa. June 4, 1996). "The rationale for binding such entities rests on the public policy that forum selection clauses promote stable and dependable trade relations, and it would be inconsistent with that policy to allow the entities through which one of the parties chooses to act to escape the forum selection clause." *Id.* (citation and internal quotation marks omitted). Cases applying this approach "focus on whether the same people were involved in all of the agreements, even if they were acting on behalf of different entities." *Id.* at *5 n. 25 (cit-

ing *Hugel,* 999 F.2d at 210; *Jordan,* 1996 WL 296540, at *6). As previously noted, Energetix, LLC, and Holdings have common ownership and control, Miller Aff. ¶ 16, ECF No. 10–2 ("Energetix Holdings II, LLC, has the same owners as Energetix, LLC: Mick Miller, Jason Jerke and myself [Mitch Miller]."), and those common owners commingled the roles of Energetix, LLC, and Holdings in the deal negotiated with All Energy. While the Court notes that simply receiving "indirect benefits that a parent corporation might receive from any transaction involving their subsidiary" presents an insufficient basis upon which to impose a forum selection clause on a nonsignatory, *AlphaPet Inc.,* 2011 WL 6004079, at *11, the present case, as alleged at this preliminary stage, evidences far more compelling and substantial contacts. Having received confidential information from All Energy through its owners and agents, and having held itself out through its agent Miller as the Energetix entity that would hold ownership of the Rosholt Plant, the Court finds it was foreseeable that Holdings would be bound by the agreement.

### iii. Miller

#### a. Miller's Relation to the NDA

 An agent who contracts on behalf of a disclosed principal and within the scope of his authority, in the absence of an agreement to the contrary, or other circumstances showing that he has expressly or impliedly incurred or intended to incur personal responsibility, is not personally liable to the other contracting party. Although he may execute the contract in a manner which would otherwise bind him personally, and he need not expressly negative his liability. The rule has been said to be applicable only to those cases in which the authority of the agent to act is not in issue.

Where an agent contracts on behalf of a disclosed principal, the true test of whether the agent is liable is whether the contract is that of the principal and the agent. An agent may prevent himself from becoming a party to the instrument by making it clear that he is acting solely in a representative capacity for a disclosed principal, and if he does this in any portion of the instrument, that is sufficient even though it may not be equally clear in other parts of the instrument.

*Pa. House, Inc. v. Kauffman's of Del., Inc.,* No. 97J–10–039, 1998 WL 442701, at *2 (Del.Super.Ct. May 20, 1998); *see also Brandt v. Rokeby Realty Co.,* No. C.A. 97C–10–132–RFS, 2004 WL 2050519, at *10 (Del.Super.Ct. Sept. 8, 2004) ("[A]n agent cannot be found liable for a contract he signed on behalf of the principal as long as somewhere in the contract it is made clear that it is between the principal and a third party . . . .").

 Here, however, no aspect of the contract actually identifies Miller as acting in his agency capacity. Instead, it indicates that the agreement is binding on "the undersigned individual or entity," thereby accommodating that the undersigned could be either. NDA 1, ECF No. 41–1. While the printed signature line reads "Mitch Miller, Energetix," *id.* at 4, it does not include language indicative of exclusive agency. *See* 3 Am.Jur.2d Agency § 168 ("In the absence of the manifestation of contrary intent therein, a contract will bind the principal and not the agent if, in the signature or description of the parties, the names of the principal and agent both appear *and the agent indicates the agency.*" (emphasis added)); *see also Pa. House,* 1998 WL 442701, at *2 ("The Agreement at issue[ ] began by identifying [the defendant individual] as an agent of [the defendant company], and identifying

the principal as [the defendant company] or 'party of the first part', thereby disclosing the agency relationship between [the defendant individual] and [the defendant company].").

The agreement indicates that all affiliates of the signatory are bound. This measure proves particularly prudent in situations, as here, where the goods sought to be protected are intangible. In *Cura Financial Services N.V. v. Electronic Payment Exchange, Inc.*, No. CIV.A. 18278, 2001 WL 1334188, at *17 (Del.Ch. Oct. 22, 2001), the court considered a non-circumvention agreement (NCA) and held that it bound not only the contracting corporation but also its employees. The NCA agreement provided that the parties signed it "separately and individually, and on behalf of their corporation and any subsidiaries, division, employees, agents, partners, and consultants whom they represent and/or with whom they may be affiliated for Processing." *Id.* (emphasis omitted). The court found the signatory employee and a non-signatory employee, who was president of the defendant corporation and for whom the signatory employee acted as agent, were bound by the agreement, further noting that "[b]inding the individual employees of [the company] to the [NCA] made commercial sense" as the other contracting party "would suffer injury from misuse of [the confidential information] regardless if it was [the company's] employee who personally exploited [the information], rather than [the company] itself." *Id.* at *17–18.

While the language in *Cura Financial* is more explicit, the NDA indicates that "the undersigned individual or entity" entered into the agreement "on behalf of itself and its affiliates." NDA 1, ECF No. 41–1. Further, the policy in *Cura Financial* remains applicable, that All Energy did not enter into an agreement with either or both of the Energetix Entities, under which All Energy provided confidential information, without assuming that those individuals obtaining the confidential information were similarly bound. *See id.* ¶ 1 (stipulating that the party receiving confidential information "may disclose [the information] only to its directors, officers, affiliates, employees, members, [and] partners . . . who are bound by the terms hereof or similar confidential obligations").

Further, even if not a signatory to the agreement, an individual can become party to the agreement by "deriv[ing] any and all benefits which accrued" under the NDA. *R.M. Williams Co. v. Frabizzio*, No. CIV.A. 90C–MY–10, 1993 WL 54423, at *10 (Del.Super.Ct. Feb. 8, 1993) ("While it is true that [the defendant] was not named in the [agreement] . . . she undertook to perform the duties of the Seller under the [a]greement and derived any and all benefits which accrued to the Seller under the [a]greement. In short, through so doing, she made herself a party to the [a]greement."). Here, as alleged by All Energy, Miller was the direct recipient of the benefit under the NDA, the confidential information. Further, Miller was the individual who took that information and discussed it with the ultimate purchaser of the Rosholt Plant, with whom Miller and the Energetix Entities now exercise control and have ownership in the Rosholt Plant.

Similar to the above consideration, Miller is bound as a party closely related to the NDA who should have foreseen being subject to the terms of the NDA. Under the NDA, Miller received confidential information, which, as alleged, he personally used for the acquisition of, ownership in, and management of the Rosholt Plant. Accordingly, the Court finds, when interpreting the facts in the light most favorable to All Energy, that the exercise of personal jurisdiction over Miller is proper.

## C. Failure to State a Claim[8]

### 1. 12(b)(6) Standard

"Federal Rule of Civil Procedure 8(a)(2), which sets forth the general rules of pleading, requires 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 664–65 (8th Cir.2012) (quoting Fed.R.Civ.P. 8(a)(2)). "This short and plain statement must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 665 (citation and internal quotation marks omitted). However, the "plaintiff's obligation to provide the 'grounds' of [its] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (second alteration in original). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (alteration in original) (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). The plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Id.* Thus, "[i]n order to successfully state a claim upon which relief can be granted, [All Energy] 'must assert facts that affirmatively and plausibly suggest [All Energy] has the right [it] claims ..., rather than facts that are merely consistent with such a right.'" *Zoltek Corp. v. Structural Polymer Group*, 592 F.3d 893 (8th Cir. 2010) (fourth and fifth alterations in original) (quoting *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir.2009) (en banc)).

### 2. Conspiracy

#### i. Conspiracy Standard[9]

"Under Iowa law, '[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful.'" *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 171 (Iowa 2002) (alteration in original) (quoting *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232 (Iowa 1977)). "Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action." *Id.* at 172 (alteration in original) (quoting *Basic Chems.*, 251 N.W.2d at 233). "It is not necessary for the underlying wrongful act to be an intentional tort, but it must be in some way actionable in the absence of the conspiracy." *Brown v. Kerkhoff*, 504 F.Supp.2d 464, 526 (S.D.Iowa 2007) (citing *Wright*, 652 N.W.2d at 172–74).

Miller and Holdings contend that All Energy has failed to state a claim upon which relief can be granted as no underlying tort to the conspiracy claim has been alleged and both defendants are safeguarded by the intra-corporate immunity

---

8. The parties do not dispute that the forum selection clause is also binding on the tort claims. *See Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 695 (8th Cir.1997) (adopting a test applied by the First Circuit Court of Appeals and finding, amongst other considerations, that when tort claims involve the same operative facts as a parallel claim for breach of contract, the forum selection clause governing the breach of contract claim applies to the tort claims).

9. While the contract claims are governed by Delaware law pursuant to the choice of law clause contained in the NDA, All Energy's tort claims, as agreed by the parties and established by case law, are subject to Iowa law. *See World Plan Exec. Council–U.S. v. Zurich Ins. Co.*, 810 F.Supp. 1042, 1046–47 (S.D.Iowa 1992).

doctrine. As Miller and Holdings have not challenged the existence of an agreement or resulting injury, the Court need only consider whether All Energy has properly alleged an independently actionable wrong underlying the conspiracy. *See Ezzone v. Riccardi,* 525 N.W.2d 388, 398 (Iowa 1994) ("For conspiracy, an agreement must exist between the two persons to commit a wrong against another. The agreement must involve some mutual mental action coupled with an intent to commit the act that causes injury."). In its Response, All Energy contends that the Amended Complaint raises breach of contract, unjust enrichment, breach of implied covenant of good faith and fair dealing, and tortious interference with a contract as underlying wrongs.

 Even assuming *arguendo* Miller and Holdings' assertion that a claim of breach of contract cannot serve as the underlying actionable wrong for conspiracy

were correct,[10] the Amended Complaint alleges unjust enrichment, which is incorporated into All Energy's civil conspiracy claim. This Court has previously found that unjust enrichment can serve as the underlying actionable wrong for a civil conspiracy claim. *Kerkhoff,* 504 F.Supp.2d at 554. Unjust enrichment, although "referred to as a quasi-contract theory, [ ] is equitable in nature, not contractual." *State, Dept. of Human Servs. ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142, 154 (Iowa 2001); *see id.* ("[Unjust enrichment] may arise from contracts, torts, or other predicate wrongs, or it may also serve as independent grounds for restitution in the absence of mistake, wrongdoing, or breach of contract."). All Energy has raised unjust enrichment against Defendants in the alternative to the breach of contract claim;[11] thus, it provides a basis upon which to bring a conspiracy claim.

10. In *Robbins v. Heritage Acres,* 578 N.W.2d 262, 263 (Iowa Ct.App.1998), the plaintiff raised negligence and civil conspiracy claims against the defendants alleging inter alia that the defendants had conspired to deprive him of necessary medical care. In denying the defendants' motion to dismiss and finding the plaintiff "sufficiently state[d] a claim upon which relief can be granted," the court noted that the plaintiff's conspiracy claim implicated the defendants' "contractual duties to [the plaintiff] and the standards of professional care and conduct of the named employees." *Id.* at 265. The court further noted that the plaintiff's "negligence claim similarly implicate[d] [the defendant's] duty of ordinary care owed to its patients." *Id.* When interpreting the holding in *Robbins,* courts have noted that negligence cannot serve as a basis for civil conspiracy; thus, the underlying action in *Robbins* was "breach of contract and/or a violation of the standards of professional care." *Doe ex rel. Doe v. Baxter Healthcare Corp.,* 178 F.Supp.2d 1003, 1020 n. 31 (S.D.Iowa 2001); *see also Wright v. Brooke Group Ltd.,* 114 F.Supp.2d 797, 836 (N.D.Iowa 2000) ("The *Robbins* court further stated that the underlying wrong of plaintiff's

civil conspiracy claim was based on breach of contract or violation of the standards of professional care."). Thus, the Court is not persuaded that Iowa law precludes the use of a breach of contract claim to serve as the underlying action to conspiracy. *See Shannon v. Gaar,* 233 Iowa 38, 6 N.W.2d 304, 307 (1942) ("[A] combination between two or more persons to cause a breach of contract is generally recognized as an unlawful conspiracy."); *see also Wilson & Co. v. United Packinghouse Workers of Am.,* 181 F.Supp. 809, 820 (N.D.Iowa 1960) (noting that the claim raised in *Shannon* was a conspiracy to cause a breach of contract).

11. The Court accepts the alternative pleading in assessing whether All Energy has sufficiently stated a claim, without regard to the potential legal collision between the asserted claims. The Iowa Supreme Court has held that "[g]enerally the existence of a contract precludes the application of the doctrine of unjust enrichment." *Johnson v. Dodgen,* 451 N.W.2d 168, 175 (Iowa 1990); *see also Stonewall v. Stonewall,* No. 98–728, 1999 WL 668741, at *5 (Iowa Ct.App. Aug. 27, 1999). "[A] plaintiff cannot recover on an implied

### ii. Intra-corporate Immunity

 Miller and Holdings contend that they are immune from conspiracy claims under the intracorporate immunity doctrine. However, Miller and Holdings have not cited, nor can this Court find, Iowa cases that have adopted or applied the principle of intra-corporate immunity. *See Cunningham v. PFL Life Ins. Co.*, 42 F.Supp.2d 872, 884 (N.D.Iowa 1999) (finding no "Iowa cases that stand for the proposition that a corporation cannot conspire to commit a common law tort with its subsidiaries or employees").

 Further, even were this Court to find the principle of intra-corporate immunity applied, case law does not support its application at this preliminary stage. *See, e.g., Gray v. AT & T Corp.*, 357 F.3d 763, 765–66 (8th Cir.2004) (discussing intra-corporate immunity while reviewing the grant of summary judgment); *Cook v. Tadros*, 312 F.3d 386, 388 (8th Cir.2002) (discussing intra-corporate immunity while reviewing the district court's grant of the defendant's motion for judgment as a matter of law during trial); *Islami v. Covenant Med. Cntr., Inc.*, 822 F.Supp. 1361, 1381–82 (N.D.Iowa 1992) (discussing the intra-corporate immunity doctrine while considering cross motions for summary judgment).[12] Were Miller and Holdings able to invoke the principle of intra-corporate immunity, All Energy argues that the personal gain exception would preclude its application, a consideration All Energy has not yet had the opportunity nor obligation to demonstrate. *See Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 601 n. 10 (8th Cir.2009) ("[A] plaintiff need not plead facts responsive to an affirmative defense before it is raised."). Based on the above, the Motion to Dismiss for failure to state a claim must be denied.

### 3. Intentional Interference with Contract–Miller [13]

 All Energy has brought a claim alleging that Miller tortiously interfered with the NDA. However, Iowa courts have held that "one cannot tortiously interfere with a contract to which one is a party." *Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.*, 481 N.W.2d 510, 518 (Iowa 1992). "This is so because ordinarily when both parties are parties to a contract the proper remedy is a suit for breach of contract."

---

contract or unjust enrichment [claim] when the alleged damages arise from a matter covered by an express written contract" unless there exists "an implied contract on a point not covered by an express one." *Brinkmann v. St. Paul Fire & Marine Ins. Co.*, No. 05–0744, 2006 WL 1750491, at *3 (Iowa Ct.App. June 28, 2006) (unpublished table decision). The Court notes, however, that in this case, as the claims arise from the same set of operative facts and the forum selection clause governs "[a]ll actions in connection with [the NDA]," NDA ¶ 14(a), ECF No. 41–1, they are both properly before this Court pursuant to the forum selection clause. *See Terra Int'l*, 119 F.3d at 694; *see also High Plains Const., Inc. v. Gay*, 831 F.Supp.2d 1089, 1100–1101 (S.D.Iowa 2011).

**12.** Miller and Holdings also cite to *Cunningham v. PFL Life Ins. Co.*, 42 F.Supp.2d 872

(N.D.Iowa 1999), for support. In *Cunningham*, the court, while considering the intracorporate immunity doctrine raised in a motion to dismiss under Rule 12(b)(6), elected not to apply the doctrine noting that Iowa law had yet to employ it, that the personal gain exception might obviate its application, and that under the circumstances "it would be premature to find that the intracorporate immunity doctrine precludes the [plaintiffs'] conspiracy claim." *Id.* at 884. Likewise, this Court finds any such ruling premature.

**13.** At this moment in the proceedings, the Court addresses the Motion to Dismiss under Rule 12(b)(6) in the context of the plausibility standard, *see* text *supra* at 993, and on the current record. Thus, having found Miller to be a party to the NDA on this record, it is axiomatic that a legal infirmity arises that was not directly addressed in the briefing.

*Grimm v. U.S. W. Commc'ns, Inc.,* 644 N.W.2d 8, 12 (Iowa 2002). As this Court has found Miller a party bound by the NDA, the proper cause of action is one for breach of contract; thus, Miller and Holdings' Motion to Dismiss for failure to state a claim on this ground must be granted.

## III. CONCLUSION

For the foregoing reasons, Miller and Holdings' Motion to Dismiss (ECF No. 10) and Amended Motion to Dismiss (ECF No. 19) must be **granted in part** and **denied in part.** Insofar as Miller and Holdings request dismissal based on lack of personal jurisdiction, their motions must be **denied.** Miller and Holdings' request that the conspiracy claim be dismissed must be **denied;** Miller's request that the intentional interference with a contract claim be dismissed must be **granted.** Miller and Holdings' Motion to Strike (ECF No. 24) also must be **denied.**

IT IS SO ORDERED.